Robert Anthony REED, III, et al., Plaintiffs,

v.

James A. RHODES, et al., Defendants.

No. C73–1300.

United States District Court, N.D. Ohio, Eastern Division.

May 25, 1994.

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, OH, David W. Whitaker, Beachwood, OH, for plaintiffs.

Frederick R. Nance, Dennis R. Terez, Squire Sanders & Dempsey, Wanda Rembert Arnold, Cleve. Bd. of Ed., Law Dept., Ricardo B. Teamor, Adrian D. Thompson, Teamor, Agyeman & Thompson, Cleveland, OH, Maree Sneed, Hogan & Hartson, Washington, DC, for Local defendants.

Stephen M. O'Bryan, Margaret Anne Cannon, Kelley, McCann & Livingstone, Mark

O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for State defendants.

Daniel McMullen, Cleveland, OH, for Office on School Monitoring & Community Relations (OSMCR).

Mark B. Cohn, Jeffrey A. Huth, McCarthy, Lebit, Crystal & Haiman, Sam A. Zingale, Granville H. Bradley, Jr., Forbes, Forbes & Associates, Cleveland, OH, for intervenors.

### ORDER

BATTISTI, District Judge.

On March 15, 1994, the Plaintiffs, Cleveland Defendants, and State Defendants (the "Parties") filed a comprehensive Settlement Agreement with this Court. Following a hearing on April 13, 1994, the Parties jointly submitted proposed findings of fact and conclusions of law. In accordance with the discussion below, the Court APPROVES the Settlement Agreement and hereby enters the same as a Consent Decree.

## I. BACKGROUND

In its initial liability order, this Court found that the Defendants had discriminated against African–American students through race-based student, faculty, staff and administrative assignments and school zoning, construction, and abandonment decisions. *Reed v. Rhodes,* 422 F.Supp. 708, 715–88 (N.D.Ohio 1976). Thereafter, in the exercise of its "equitable powers to remedy past wrongs," the Court ordered a comprehensive remedial plan designed to address the various harms caused by these constitutional violations. *Reed v. Rhodes,* 455 F.Supp. 546, 568 (N.D.Ohio 1978), *aff'd,* 607 F.2d 714 (6th Cir.1979), *cert. denied,* 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980).

Determining that "federal courts must on occasion address [educational issues] ... to eliminate the effects of prior segregation," *Reed,* 455 F.Supp. at 597, the Court instructed the Defendants "to develop educational programs that will correct the effects of prior segregated schooling to the greatest extent possible." *Id.* Specifically, the Defendants were directed to include such programs intended to improve reading achievement, en-hance counseling and career guidance services, create magnet school opportunities, encourage greater cooperation with universities, businesses and cultural institutions, ensure equity in extra-curricular activities, provide staff development in human relations, protect student rights, and build stronger school-to-community relations. *Id.* at 598–602. These educational programs were intended to help make whole the Plaintiff school children by, among other things, remedying "the academic effects of prior segregation." *Id.* at 598.

In 1987, after years of recalcitrance, the Cleveland Defendants ("the District") concluded that they were "prepared to shift [their] focus to the educational outcomes that are the heart of the Remedial Order." Local Defendants' Status Report and Motion for Expedited Payment at 7–9 (filed September 1, 1987). The District subsequently adopted a "Mission Statement" that acknowledges the interrelation between quality education and the Defendants' constitutional obligation to desegregate:

> The District shall guarantee the equal protection of all affected classes of students and of each individual student and shall pledge to affirmatively address the effects of past segregation as it strives for excellence and equity and to prepare students to be happy, healthy, and productive participants in a pluralistic society.

Board Policy, § 9710 (adopted January 11, 1990).

In 1990, the Court established a process to determine the status of compliance with the remedial orders in this case. *See* July 10, 1990 Order. That process resulted in three reports from the Office on School Monitoring and Community Relations ("OSMCR"). OSMCR Report Pursuant to Order of July 10, 1990 (July 29, 1991) ("OSMCR Report"); OSMCR Supplemental Report (May 6, 1992); OSMCR Second Supplemental Report (November 12, 1993). While OSMCR reported that the Defendants "have made efforts to eliminate racially discriminatory practices," it also noted the Court's pronouncement that, "[t]he remedial orders ... [were] not intended to produce equal access to mediocre schools." OSMCR Report at II–1 (quoting

Proceedings before the Court, November 2, 1987). OSMCR further noted that the Defendants have not complied with some remedial orders "intended to eliminate educational vestiges of past discrimination." *Id.* OSMCR's reports detailed the factual bases for its recommendation that the Defendants

> propose such changes to Remedial Orders as may be appropriate to better meet their constitutional obligation to develop educational programs that will "correct the effects of prior segregated schools," eliminate "the vestiges of a dual educational system" and restore "administrative competence, financial stability, and academic excellence."

*Id.* at II–3 (quoting Remedial Order at 72 (February 6, 1978), Memorandum Opinion and Order at 40 (July 25, 1980), and Remand Opinion at 48 (February 6, 1978)).

After the submission of these OSMCR reports, the Parties were ordered to meet and discuss these issues. *Reed v. Rhodes*, 1992 WL 80626, 1992 U.S.Dist. LEXIS 4723 (N.D.Ohio, April 2, 1992). The Defendants were directed to include in their discussions and planning "any aspect of the operation of the school district where such vestiges may appear. Indeed, you are encouraged to address all areas where such vestiges appear." *Id.* at *3. The Parties were prompted to "think about innovative programs and undertakings, where such programs offer a realistic promise of eliminating remaining vestiges." It was also noted that the Parties could consider "reasonable methods of student assignment." *Id.* at *4. The Court reiterated that "the State must be actively involved in helping the District improve the relevant day-to-day practices that bear on vestiges of past discrimination and affect educational outcomes." *Id.* at *4.

In response to these directives, the District analyzed data on educational achievement by race in the Cleveland Public Schools, and concluded that the performance disparities between racial groups were due in part to the Defendants' failure to fully comply with their constitutional obligations. Joint Findings of Fact and Conclusions of Law Proposed by the Parties at ¶ 6.

In part to address these deficiencies and better to assure stable desegregated enrollments, the District created a new educational plan known as VISION 21 with the goal of fully complying with this Court's mandate that segregation be eliminated "root and branch." *See Green v. County School Board of New Kent County*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). In designing this educational plan, the District sought to increase substantially the opportunity for all students, particularly African–American students, to receive a high-quality education in a desegregated environment through the systematic upgrading of the general curriculum, the creation of community model schools, a substantial broadening of the magnet school program based upon demonstrated demand, and the gradual implementation of a controlled-choice student assignment plan. Joint Findings of Fact and Conclusions of Law Proposed by the Parties at ¶ 7.

The first year of implementation of key components of VISION 21 is in progress. Pursuant to the Parties' agreement reflected in the Court's Order of July 21, 1993, the State agreed to pay fifty percent of the cost of five components of VISION 21 for the 1993–94 school year.

Pursuant to this Court's instructions of October 18, 1993, the District continued to negotiate its remedial proposals with the State and Plaintiffs in an effort to reach a consensus on "what changes, if any, are to be implemented in the 1994–95 school year and thereafter, including how they are to be paid for." Oct. 18, 1993 Proceedings at 52. The extensive negotiations, which have been ongoing since the fall of 1993, have involved all of the Parties and OSMCR. On February 24, 1994, the Parties presented to this Court a Memorandum of Points of Agreement between the Parties to *Reed v. Rhodes*. The Settlement Agreement submitted to the Court on March 15, 1994 is an elaboration of this Memorandum of Points of Agreement and the final result of these negotiations.

As anyone who has followed the long (and often bitter) struggle that has accompanied this litigation must realize, it is simply impossible to overstate the profound significance of

the Parties finally reaching a negotiated settlement. Similarly, it would be virtually impossible to overstate the impact that attorney Daniel J. McMullen, the Director of OSMCR, has had in bringing about this historic event. Nevertheless, the Court deems it appropriate to add a few words about Mr. McMullen's exemplary and tireless efforts.

At Mr. McMullen's counsel, the course to the just and orderly resolution of this case was charted with the issuance of the Court's remarks to the Parties at the March 13, 1992 status conference. Throughout the negotiation process, Mr. McMullen persistently and effectively encouraged the parties to negotiate rather than litigate, deftly guiding their discussions around many apparent impasses as an impartial mediator. In this role, he conducted himself according to the highest standards of his profession.

Despite these words of honor, those who have not been closely involved with these proceedings may never realize how crucial a role Daniel J. McMullen has played in facilitating the agreements of the Parties. There is little doubt that were it not for his energy and commitment, there would not presently be a Settlement Agreement awaiting the Court's approval.[1]

## II. REQUIREMENTS FOR CLASS ACTION SETTLEMENT

█ To settle a class action lawsuit, Fed. R.Civ.P. 23(e) requires prior court approval. Rule 23(e) provides:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Three steps are required: 1) the court must preliminarily approve the proposed settlement; 2) members of the class must then be given notice of the proposed settlement; and 3) a hearing must be held to determine whether the proposed settlement is fair, reasonable and adequate. *Williams v. Vukovich,* 720 F.2d 909, 921–22 (6th Cir.1983); *Stotts v. Memphis Fire Department,* 679 F.2d 541, 551 (6th Cir.1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Bronson v. Board of Education of the City School District of the City of Cincinnati,* 604 F.Supp. 68 (S.D.Ohio 1984).

### A. Preliminary Approval

On March 18, 1994, this Court preliminarily approved the proposed Settlement Agreement. This Court based its preliminary approval on its experience over twenty years with this case, its intimate familiarity with the evidence, problems and issues in these proceedings, and the character of the negotiations among the Parties with the assistance of OSMCR.

### B. Notice of the Proposed Settlement

█ Notice of the proposed settlement and the fairness hearing must be provided to class members. *Bronson,* 604 F.Supp. at 71; *Vukovich,* 720 F.2d at 921; *Stotts,* 679 F.2d at 551.

Contemporaneous with preliminary approval of the proposed Settlement Agreement, the form of notice proposed by the Plaintiffs was approved, and it was ordered that notice be published on two separate occasions in both the *Plain Dealer* and the *Call & Post* between March 21, 1994 and March 31, 1994. The hearing notice and the proposed Settlement Agreement itself (without Appendices A and B) were published as directed. The notice and the Settlement Agreement were also made available at locations throughout the District. In addition, class members and other interested persons received notice through other means; this case is of significant public interest, and it has been covered extensively by the Cleveland media.

---

1. Cleveland School Board President Lawrence A. Lumpkin testified at the Fairness Hearing that "without the expertise and diligent attention that has been given to this process by the Office on School Monitoring and [its] current Director, we would not be where we are today." (Tr. at 57). The State Superintendent of Public Instruction and Plaintiffs' Counsel joined in recognition of Mr. McMullen's efforts. (Tr. at 125, 159).

The notice was sufficient to allow class members "a full and fair opportunity to consider the proposed decree and develop a response." *Vukovich,* 720 F.2d at 921.

## C. *The Fairness, Reasonableness and Adequacy of the Proposed Settlement*

On April 13, 1994, a hearing (the "Fairness Hearing") was held to afford the Parties, class members, and other interested members of the Cleveland community an opportunity to comment on the proposed Settlement Agreement.

■ The law generally favors and encourages the settlement of class actions. *Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir. 1981), *vacated on other grounds and modified,* 670 F.2d 71 (6th Cir.1982). Settlements are particularly valuable in complex institutional reform cases such as this one, where any actual remedial measures must be implemented by the defendants over significant periods of time and must have substantial public support to be successful.[2]

■ The Court is not required to reach ultimate conclusions of fact or law on the issues in the case, but instead should examine the overall fairness and adequacy of the settlement in light of the likely outcome and costs of continued litigation. *Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F.Supp. 1, 6–7 (N.D.Ohio 1982); *In re Art Materials Antitrust Litigation,* 100 F.R.D. 367, 370 (N.D.Ohio 1983); *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

■ In determining whether a proposed class action settlement is fair, reasonable and adequate, a number of factors should be considered. *See, e.g., Bronson,* 604 F.Supp. at 73; MANUAL FOR COMPLEX LITIGATION, §§ 23.14, 30.4 (2d ed. 1985), 3 B. James W. Moore and John E. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23.80[4] at 23–485 to 23–496 (2d ed. 1993). The relevant areas of inquiry include: (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the objections raised by class members; and (7) the public interest. *Vukovich,* 720 F.2d at 922; *Bronson,* 604 F.Supp. at 73; *Thompson v. Midwest Foundation Ind. Physicians Ass'n,* 124 F.R.D. 154, 157 (S.D.Ohio 1988).

### (1) *The Likelihood of Ultimate Success on the Merits Balanced Against the Relief Offered by the Proposed Settlement Agreement*

■ The District was the principal proponent of the VISION 21 remedial programs that lie at the heart of this Settlement Agreement, and both the Plaintiffs and the District believe the VISION 21 program elements are necessary to address the remaining vestiges of unconstitutional conduct by the Defendants. But the District and the Plaintiffs would face potential risks if they sought greater State funding through litigation. The State Defendants have denied that many of the conditions which the District and the Plaintiffs assert to be vestiges of segregation are linked to past discriminatory conduct. The State also has denied responsibility for these conditions. As a result, the District and the Plaintiffs face the possibility, however remote, that they could lose a motion seeking greater support for these programs from the State.

If the Court ultimately denied such relief, the Plaintiffs would face the near certainty that the District would be unable to implement much of the proposed plan. The Cleveland Public Schools are anticipating a significant budgetary shortfall for the 1994–95 fiscal year, as Board President Lawrence A. Lumpkin testified. Since the District is obliged by State law to balance its budget, severe budget cuts have been made and more may follow. The District, therefore, is incap-

---

**2.** For an excellent discussion of the value of negotiated settlements in school desegregation cases, *see,* Daniel J. McMullen and Irene Hirata McMullen, *Stubborn Facts of History—The Vestiges of Past Discrimination in School Desegregation Cases,* 44 C.W.R.Law Rev. 75.

able of paying the full costs of implementing all of the remedial programs of VISION 21 without substantial assistance from the State Defendants or the people of the District through taxation.

Moreover, the Plaintiffs and the District would face litigation risks even if they were to prevail in a motion against the State. The mere initiation of an appeal by the State could undermine the prospects for success of, and community support for, the proposed educational programs. One of the principal advantages of this Settlement Agreement is the stability provided by the Agreement's six-year term. The State's unambiguous financial and supervisory commitments to the Cleveland Public Schools also provide significant reasons to expect that the Cleveland community will support the District in its efforts to meet its remedial obligations, bring this case to an orderly and just resolution, and offer a high quality education in a desegregated setting to all students. The comments received from community leaders, such as the Mayor, members of the City Council, the Greater Cleveland Roundtable, the Cleveland Initiative for Education, the Cleveland Teachers Union, and the Cleveland Branch of the NAACP, all attest to this fact. Division between the Parties caused by litigation and prolonged by appeal could undermine this mounting support for the ongoing effort to improve the Cleveland Public Schools for the Plaintiff schoolchildren and all Cleveland students.

Balanced against the possible risks posed by continued litigation, the Settlement Agreement is fair, adequate, and reasonable. The Settlement Agreement imposes substantial responsibilities on both Defendants. Through funding matched in part by the District, the Settlement Agreement provides for more than half a billion dollars in remedial programs to benefit the Plaintiff class, and all Cleveland students, over the next six years. The State's commitment alone is $295,000,000. Recognizing the District's present financial condition, the Settlement Agreement requires the District to exercise diligently its authority to attempt to raise funds in the interest of Cleveland's children. After extensive negotiations, the Parties have jointly concluded that these contractual obligations provide the best prospect for ensuring adequate relief to the Plaintiff class without undermining the District's financial viability.

Given the important role played throughout this litigation by the NAACP, the Court assigns great weight to the statement of the Cleveland NAACP President, George Forbes, who said of the Agreement: "We support it because it provides the commitment, funding, and structures to complete the process of ridding this school system of the unconstitutional racial discrimination and segregation which prompted this litigation." (Tr. at 131). The proposed Settlement Agreement is not limited to financial commitments, however. The State, for example, will also take a more active role in monitoring the District's compliance and will participate in a joint effort to establish voluntary interdistrict transfer programs in the Cleveland metropolitan area. The District has agreed to achieve and maintain desegregated school enrollments within parameters agreed upon by the Parties, and to intervene to reform schools that are not showing adequate academic progress. These commitments extend for the next six years.

In sum, there is some risk that neither the Plaintiffs nor the District could obtain through litigation monetary and non-monetary relief as substantial as that provided by the Settlement Agreement. While little doubt exists about this Court's power to order such relief as may be necessary to remedy the harms caused by the constitutional violations in this case, the relief promised by this Agreement is fair and reasonable to the Plaintiff class given the risks of continued litigation. The fairness and reasonableness of this Agreement is particularly clear because it explicitly acknowledges the Defendants' obligation to demonstrate that they have eliminated the vestiges of segregation to the extent practicable before this Court may relinquish its jurisdiction. *Freeman v. Pitts,* — U.S. —, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

### (2) *The Complexity, Expense and Likely Duration of the Litigation*

This action has been complex, expensive, and often marked by divisiveness rather than

cooperation. This fact complicated the already difficult task of desegregating a dual school system. It has been similarly difficult to envision how long it would take to bring this case to an orderly and just resolution. Consequently, two years ago the Parties were admonished to meet and work in good faith to reach a consensus. *Reed v. Rhodes,* 1992 WL 80626, 1992 U.S.Dist. LEXIS 4723 (N.D.Ohio, April 2, 1992).

This action has already proceeded for more than two decades with settlement negotiations alone proceeding for roughly the past two years. Further litigation over appropriate remedial measures would be time consuming and expensive for all of the Parties. Even without an appeal, attempts to develop and implement whatever measures the Court ultimately ordered would also be similarly time consuming and expensive.

The Settlement Agreement provides the opportunity for the Parties to achieve the goal of providing the District's school children with a quality education in a desegregated setting without further litigation. It promises expeditiously to make this long-deferred dream a reality in Cleveland. While the task at hand remains immense, experts such as Dr. Gordon Foster and Dr. Robert Green have given this Court a solid basis to believe that this Agreement offers a combination of remedies that promises realistically to work. The Court also attaches great significance to the observation made at the fairness hearing by Plaintiffs' Class Representative Rhonda Eberhardt, that "the provisions of the Settlement Agreement formed the foundation for much needed parental involvement." (Tr. at 142). In addition, the Court has followed media reports concerning student safety. In that regard, the Court hopes it is true, as noted by Plaintiffs' Class Representative Rashidah Abdul-Haqq, that "the plan does provide for the implementation of safety initiatives in all of the District's 127 schools," and that "the students' abilities to achieve and realize their full potential will be greatly enhanced." (Tr. at 148).

### (3) *The Stage of the Proceedings*

As noted above, liability was found in this case eighteen years ago. This Court entered its Remedial Order sixteen years ago and worked strenuously to encourage the parties to settle this case long before that. Despite the long life of these proceedings, OSMCR's extensive analysis reveals that full compliance with the extant remedial orders has not yet been achieved. The Parties have stipulated to this conclusion. (Settlement Agreement, § 9).

### (4) *The Opinion of Class Counsel*

Plaintiffs' counsel, who are experienced both in this case and other desegregation matters, were able to enter into this Settlement Agreement with full knowledge of the relevant considerations. (Likewise, the District and State were able to determine that the Settlement Agreement would improve their ability to meet their remedial obligations.) Based on the foregoing facts, the opinion of Plaintiffs' counsel that the proposed Settlement Agreement is fair, adequate, and reasonable is an important factor in the Court's consideration.

### (5) *The Negotiation Process*

The Settlement Agreement is the product of serious, informed, good-faith, arms-length negotiations concerning difficult remedial issues. The terms of the Settlement Agreement suggest no bias, collusion, or coercion in favor of any party or subgroup of class members. The Court is intimately familiar with the issues in this case and the evidence of the Defendants' level of compliance with the Remedial Orders through the submissions of the Parties and the work of OSMCR. The Agreement represents a balanced resolution of many complex outstanding legal and factual issues. The evidence concerning the negotiating process itself confirms that the negotiations, though ultimately fruitful, were protracted, arduous, uncertain, and, at times, fragile. In sum, there is no evidence whatsoever of fraud or collusion in the negotiation process.

### (6) *Objections Raised by Class Members*

■ A court should not withhold approval merely because some class members object to the agreement. *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Bronson,* 604 F.Supp. at

73. In considering the extent of opposition, the Court also must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis. *Armstrong v. Board of School Directors,* 616 F.2d 305, 315 (7th Cir.1980); *Bronson,* 604 F.Supp. at 78.

In response to the Notice of Settlement provided to all class members, nine written comments were submitted. (Only eight of these individuals chose to make oral statements at the hearing.) One of these comments was supportive of the entire Settlement Agreement. Four others were generally supportive, but requested additional flexibility for the District in terms of the racial guidelines for student enrollment. The Parties also offered several additional comments from community leaders expressing unequivocal support for the Agreement. On the whole, therefore, there was very little opposition to the proposed Settlement Agreement.

Moreover, most of the objections to the Settlement Agreement focused only on particular provisions that may be modified by the parties under the express terms of the Settlement Agreement if such provisions prove unworkable. For example, as noted above, four members of the Plaintiff class requested additional flexibility in racial enrollment guidelines, particularly as they apply to the proposed community model schools. The Settlement Agreement makes clear that the Parties may, if so persuaded by subsequent facts or events, adopt this or other changes.

Another comment was based entirely on the mistaken assumption that the Defendants could now successfully seek unitary status. This Court rejected such a motion on behalf of the District in 1990, and no evidence has been presented to the Court to indicate that since then the Defendants have achieved full compliance with outstanding orders or eliminated the remaining vestiges of segregation to the extent practicable. Indeed, the Parties have stipulated to the contrary (Settlement Agreement § 9), and the comments of spokespersons representing the Plaintiffs and Cleveland District at the Fairness Hearing indicate that these two parties firmly believe that some vestiges of the prior unlawful conduct remain. The Parties have specifically provided that, on or before July 1, 1997, the Court will be asked to conduct an evidentiary hearing to permit the Defendants to demonstrate that they have fully complied with the terms of this Agreement and all extant remedial orders, and that all vestiges of past discrimination and segregation have been eliminated to the extent practicable. If such a showing is made, this Court would have the basis for concluding that unitary status has been achieved and for terminating its jurisdiction, except to enforce the Settlement Agreement.

Two members of the Plaintiff class also objected to a number of particular provisions of the Agreement and generally to the adequacy of their representation by class counsel. The Court finds, however, that class counsel have more than adequately represented the interests of the Plaintiff class and obtained meaningful relief for its members in the form of this Agreement. Not all class members will agree with every aspect of the Settlement Agreement and the remedial programs. Nonetheless, the Court finds that as a whole the Settlement Agreement offers a reasonable approach to the Defendants' outstanding remedial obligations.

Finally, many of the comments alluded to the lack of greater remedial progress to date and the need for increased accountability for the District's future efforts. These concerns must be addressed with particular attention. It is clear that the students coming out of Cleveland Public Schools in recent years have not, on the whole, demonstrated the level of educational achievement that was contemplated by the remedial orders, or indeed reasonably expected by the community. Cleveland School Board President Lawrence A. Lumpkin testified that there have been "deficiencies in the delivery of education," and that "this is the first time in the history ... of this case, that this district has made such a concerted effort" to comply with the educational components of the remedial orders. (Tr. at 60–61).

In light of such educational inadequacies, it is hardly surprising that many of the speakers at the Fairness Hearing expressed doubts about the ability of the school system

to realize substantial educational improvements. Nevertheless, the Parties have appropriately set high expectations for the District's future performance. For instance, the Court takes special notice of some of the educational provisions in the Settlement Agreement:

    (a) The District will implement new programs, "to ensure that by the end of the first grade all children will read." (Settlement Agreement, Appendix B–4).

    (b) The District will undertake substantial efforts to help students pass the proficiency tests, particularly concerning "higher level mathematics and science courses." (Settlement Agreement, Appendix B–8). .

    (c) New projects will be developed to "improve the learning climate and provide a safe and secure environment." (Settlement Agreement, Appendix B–10).

    (d) Schools will be subjected to "appropriate intervention strategies" if their students score poorly on standardized tests. (Settlement Agreement § 11.2).

The Plaintiffs, the State Defendants and the Court, through OSMCR, are pledged to closely monitor the District's efforts to fulfill these and other commitments to improve the education of Cleveland students. Pursuant to the Agreement, the Parties will meet on July 1, 1994, and at least annually thereafter, to assess the "status of Consent Decree implementation and compliance with relevant remedial orders." (Settlement Agreement § 13.1). Following these meetings in 1995 and 1996, the Parties are required to report their findings to the Court. (Settlement Agreement § 14).

These regularly scheduled meetings and joint reports will enable the Parties, the Court and the Public to evaluate, among other things, the educational progress of the District. If particular programs are not achieving results, or funds are not being spent effectively, these meetings and reports will permit such problems to be identified and modifications to be implemented.

However, the vigilance contemplated by the Parties may prove fruitless unless there are well defined measures by which progress may be judged. It is therefore important that the District disseminate publicly a description of the educational outcomes it expects to achieve as a result of its new educational initiatives.[3] Where possible, these intended outcomes should be statistically verifiable and set forth on a specific timetable. This information must be submitted in sufficient detail to OSMCR to allow it to carry out its agreed upon monitoring and reporting function. *See* Settlement Agreement § 12.3.[4] A sufficient level of specificity in this regard at the outset will permit appropriate assessment of concrete results in the future.

### (7) *The Public Interest*

The District is the largest school system in Ohio. The public interest, particularly that of the District's students, lies in ensuring that the District and State provide a higher quality education in a desegregated setting, with appropriate documentation of intended and actual results. *See supra* § II.C.6. The public interest also lies in removing any lingering vestiges of segregation in the District. In a predominantly minority school district, effective educational reform targeted at African–American students, by definition, serves the public good. Moreover, as Superintendent Parrish testified, the key components of VISION 21 which will be implemented under the Settlement Agreement, are intended to address the needs of all students and help prepare all of Cleveland for the 21st Century. The Court also agrees with Superintendent of Public Instruction Ted Sanders that the Settlement Agreement promises to serve these interests by bringing together all of the

---

**3.** Superintendent Parrish testified that these achievements will include improvements in attendance, graduation rates, and test scores; better preparation for entry into the work force or higher education; and decreases in disciplinary problems. (Tr. at 104). The Superintendent alluded to the yet unpublished "Targets 2000." (Tr. at 82). Presumably, this document recites the kinds of specific results that can be expected.

**4.** The Court expects that this information will be incorporated in the redefined reporting regime which the Parties are to adopt no later than October 1, 1994. *See* Settlement Agreement § 12.1.

Parties in a concerted effort to achieve, as quickly as possible, the remedial goals identified by this Court long ago.

The importance of the fact that the Parties actually have reached an agreement in this case should not be overlooked. This long-awaited consensus should enable the Parties to move this case forward to its orderly and just resolution, supporting each other's efforts rather than undermining them. The joint action of the Parties also should inspire cooperation in the larger community. A cooperative effort is clearly the best way to resolve such a complex institutional reform case that affects so much of the public. Therefore, the Court finds that it is particularly significant to the public interest that the Parties have agreed to a comprehensive plan intended to remedy any lingering vestiges of the constitutional violations in this case. As in the past, and now pursuant to the Parties' Agreement, the Court expects to rely heavily upon OSMCR and its Director to keep the Court, Parties, and public informed about the continuing progress toward the orderly and just resolution of this case.

## III. CONCLUSION

Since the inception of this lawsuit some twenty years ago, certain voices have repeatedly demanded that the Court terminate its involvement with the Cleveland Public Schools. Somehow it often seemed to escape such critics that fundamental guarantees of the Constitution were at stake. Meanwhile, thousands of African–American students continued to suffer from the vestiges of intentional segregation.

More responsible observers have also contemplated the end of judicial involvement in the Cleveland Public Schools. However, those with true vision have looked forward not simply to the absence of court orders, but rather to the absence of the *need* for court orders. With the submission of the Settlement Agreement, the Parties have taken a great stride towards changing this aspirational view into a concrete picture. As the Court noted in the Fairness Hearing, "the result is not the product of the Court. This is the Parties' agreement: it is written in their language; it contains their commit-

ments; and it recites their responsibilities." (Tr. at 3).

Thus, the Parties have evidenced a commitment to proceed on their own. While the efforts of the Parties in reaching agreement are undeniably positive, much truly difficult work lies ahead. The educational objectives contemplated by the Settlement Agreement will not be easy to achieve. Passage of a levy in order to provide sufficient local resources to match the State's contribution to underwrite the specified educational initiatives remains a challenge to which the Parties committed, in their Settlement Agreement, to undertake.

The Parties now share the responsibility of going beyond the mere planning to the actual implementation of their plan. In so doing, they must heed the repeated admonition of the Court that they, who attend and operate the schools, "acting *together* and with a sense of purpose must now step forward and take action to serve the best interests of all the students of the Cleveland Public Schools."

The Court has considered the entire proceedings in this case, the reports of OSMCR, the evidence submitted by the Parties, the opinion of Plaintiffs' counsel, all of the written comments filed in response to the notice, and the oral comments made at the hearing. Based on all of this evidence, the Court finds that the Settlement Agreement is fair, reasonable, and adequate. Accordingly, the Court hereby enters this Order converting the Settlement Agreement into an enforceable Consent Decree.

**IT IS SO ORDERED**