Anthony T. LEE, et al., Plaintiffs,

United States of America, Plaintiff–Intervenor and Amicus Curiae,

National Educational Association, Inc., Plaintiff–Intervenor,

v.

RANDOLPH COUNTY BOARD OF EDUCATION, et al., Defendants.

Civ. A. No. 847–E.

United States District Court, M.D. Alabama, Eastern Division.

Feb. 17, 1995.

Solomon S. Seay, Jr., Montgomery, AL, for plaintiffs and plaintiff-intervenor.

Sabrina Whitehead Jenkins, Dana R. Carstarphen, Jeremiah Glassman, LeVern M. Younger, Steven Butler, Derek Loeser, Deval L. Patrick, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for amicus U.S.

George Lamar Beck, Jr., Dennis Richard Pierson, William Terry Travis, Beck & Travis, P.C., Montgomery, AL, for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

This longstanding school desegregation lawsuit was reopened last year when the plaintiffs—black school children and parents representing a class of people similarly situated—and plaintiff-intervenor United States filed motions for further relief alleging that defendant Randolph County Board of Education and its officials had violated prior desegregation orders and federal law. At the urging of the parties, the court approved a consent decree governing operations of the Randolph County school system. The question now before the court is whether to approve an amendment to the consent decree concerning the former principal of Randolph County High School, Hulond Humphries. For the reasons that follow, the court approves the amendment.

## I. BACKGROUND

The extensive past history of this lawsuit, which has been ongoing for approximately 30 years, can be summarized by noting that, starting in 1967, prior orders of a three-judge

court required the Randolph County School District to desegregate its school system.[1]

The present phase of this lawsuit began on May 17, 1994, when the United States filed a motion for supplemental relief. The plaintiffs filed their own motion for further relief on July 1, 1994, and amended that motion on July 18, 1994. The plaintiffs and the United States alleged that Randolph County school officials had violated prior desegregation orders and federal law by engaging in racially discriminatory practices and failing to operate the schools on a nondiscriminatory basis. The plaintiffs and the United States contended that desegregation orders were not implemented in the areas of faculty and administrative hiring, discipline, and curriculum and that the Randolph County School District had created a racially hostile environment.

A major part of the contentions of the plaintiffs and the United States surrounds Humphries, who was principal of Randolph County High School from 1968 to 1994. Because the parties have agreed to settle the issue of Humphries, the court need not make ultimate findings of fact with regard to his conduct. Rather, the court provides a description of the allegations.

The plaintiffs and the United States cite a number of ways in which Humphries allegedly created a racially hostile environment. They contend, among other things, that Humphries discriminated on the basis of race in both frequency and severity of discipline,[2] that he denied black students equal opportunity to participate in extracurricular programs,[3] that he had a policy against interracial social relationships,[4] and that he made derogatory statements about blacks.[5] The plaintiffs and the United States also contend that Humphries was responsible for employment discrimination at the high school.[6]

Finally, the court briefly notes allegations regarding Humphries's behavior with regard to the 1994 Randolph County High School Prom. On February 24, 1994, Humphries convened an assembly to discuss the upcoming prom.[7] Humphries says he was concerned about potential violence because of interracial dating.[8] During the course of the assembly, Humphries asked students who were taking a person of a different race to the prom to raise their hands.[9] Some people contend that, in an ensuing confrontation, Humphries called a mixed-race student a mistake.[10] Humphries denies this allegation.[11] There are many different interpretations of exactly what Humphries said.[12] Af-

---

1. *Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458 (M.D. Ala.) (three-judge court) (per curiam), *aff'd mem.*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); order of June 16, 1970 (three-judge court).

2. Plaintiffs' pre-trial brief, filed December 27, 1994, at 8; United States's pre-trial brief, filed December 27, 1994, at 18–20.

3. Plaintiffs' pre-trial brief, filed December 27, 1994, at 9–10; United States's pre-trial brief, filed December 27, 1994, at 20–21.

4. Plaintiffs' pre-trial brief, filed December 27, 1994, at 11–12; United States's pre-trial brief, filed December 27, 1994, at 10–12.

5. Plaintiffs' pre-trial brief, filed December 27, 1994, at 12–13; United States's pre-trial brief, filed December 27, 1994, at 16–18.

6. Plaintiffs' pre-trial brief, filed December 27, 1994, at 14; United States's pre-trial brief, filed December 27, 1994, at 21–25.

7. May 27, 1994 report by the United States Department of Education, Office for Civil Rights, filed on August 2, 1994 as Exhibit 1 to the United States's motion for preliminary injunction, at 2; United States's pre-trial brief, filed December 27, 1994, at 12; Randolph County School Board's pretrial brief, filed January 6, 1995, at 3.

8. Randolph County School Board's pretrial brief, filed January 6, 1995, at 3.

9. May 27, 1994 report by the United States Department of Education, Office for Civil Rights, filed on August 2, 1994 as Exhibit 1 to the United States's motion for preliminary injunction, at 3; United States's pre-trial brief, filed December 27, 1994, at 12; Randolph County School Board's pretrial brief, filed January 6, 1995, at 3.

10. *See* United States's pre-trial brief, filed December 27, 1994, at 12.

11. Randolph County School Board's pretrial brief, filed January 6, 1995, at 3.

12. *See* May 27, 1994 report by the United States Department of Education, Office for Civil Rights, filed on August 2, 1994 as Exhibit 1 to the United States's motion for preliminary injunction, at 3–5.

ter the assembly became tumultuous, Humphries, for whatever reason, cancelled the prom.[13] The prom was reinstated, but on March 14, 1994, the school board suspended Humphries pending an investigation. Humphries was reinstated on March 31, 1994. During the course of this lawsuit, after Randolph County High School was partially destroyed by fire, the school board reassigned Humphries to an administrative position in the district's central office.[14] The school board has consistently denied wrongdoing with regard to the allegations of the plaintiffs and the United States.

After extensive negotiations, the parties submitted a consent decree, which the court approved on December 15, 1994. The decree addressed many aspects of the operation of schools in Randolph County to ensure compliance with prior court orders and federal law. In broad outline, the consent decree (1) created a bi-racial committee to implement the decree and promote racial harmony in the schools; (2) enjoined the school district from discriminating in employment; (3) set hiring goals for African–American employees and standards for recruiting blacks; (4) changed disciplinary procedures; (5) required non-discriminatory transportation and attendance policies; (6) mandated efforts to improve race relations; and (7) ensured equal opportunity in curricular offerings. The decree provided that the court retain jurisdiction "to monitor the implementation of the provisions of the Consent Decree, to insure that the School District is operating on a non-discriminatory basis in these respects and to consider any further proceedings in this case." The decree settled all of the issues raised by the plaintiffs and the United States except for one. The issue left open was the question of Humphries's employment with the school district.

The parties prepared to try the issue of Humphries's future employment. The plaintiffs requested that the court order Humphries terminated by the school district.[15] The United States requested an injunction preventing Humphries from being on the grounds of any school campus during school hours and from having contact with students.[16] The school board, noting that Humphries occupied a position that did not bring him into contact with students, argued that he should be allowed to stay in that position without unnecessary restrictions.[17]

Before the question of Humphries's future employment went to trial, however, the parties reached an agreement as set forth in a proposed amendment to the consent decree submitted on January 9, 1995. The amendment provides that Humphries be employed as a consultant to the Randolph County Board of Education until July 1997. Any employment after that date would be pursuant to the mutual agreement of Humphries and the school board and must be consistent with the terms of the consent decree and the amendment to the decree. Under the amendment, the school board has the duty of supervising Humphries and assigning his duties. Among his duties, Humphries will likely supervise the rebuilding of Randolph County High School. The amendment prevents Humphries from appearing on school campuses during school hours except for attending events open to the general public.

The same day the amendment was submitted, the court received a letter and motion from Reverend Emmett T. Johnson stating that Solomon Seay, the attorney for the plaintiffs, had not consulted the African–American community before agreeing to the amendment and that some members of the plaintiff class opposed the settlement. Because of the concerns of Reverend Johnson and others, the court held off final approval of the amendment in order to hear the substance of the objections.

---

**13.** United States's pre-trial brief, filed December 27, 1994, at 12; Randolph County School Board's pretrial brief, filed January 6, 1995, at 4.

**14.** Letter from George Beck to the court, dated and filed on August 9, 1994.

**15.** Plaintiffs' pre-trial brief, filed December 27, 1994, at 15.

**16.** United States's pre-trial brief, filed December 27, 1994, at 26–27.

**17.** Randolph County School Board's pretrial brief, filed January 6, 1995, at 25.

Accordingly, the court tentatively approved the amendment to the decree, subject to notice, opportunity for objections, and a fairness hearing to be conducted pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.[18] The court received approximately 265 written objections. On February 10, 1995, the court held a fairness hearing to give the citizens of Randolph County, in particular black school children and parents, an opportunity to voice their concerns about the amendment to the decree. Nine people spoke, all in opposition to the amendment. The parties made arguments and presented evidence—including testimony from plaintiffs' attorney Seay—as to why the amendment to the decree should be approved. The court must now make its decision.

## II. DISCUSSION

### A. Standards for Review of Consent Decrees

▪ It is well established that voluntary settlement is the preferred means of resolving class action lawsuits. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977).[19] The court has previously applied this judicial policy to racial discrimination class actions outside the school desegregation context. *E.g.*, *White v. State of Alabama*, 867 F.Supp. 1519, 1533 (M.D.Ala.1994) (voting rights); *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511, 1516 (M.D.Ala.1994) (employment discrimination). The court finds that the same principle is applicable to school desegregation lawsuits. *See Armstrong v. Bd. of School Directors*, 616 F.2d 305, 318 (7th Cir. 1980).

▪ The court realizes, however, that the settlement process is susceptible to certain types of abuse and, as a result, the court has a heavy, independent duty to ensure that the settlement is fair, adequate, and reasonable. *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway v. American Cast Iron Pipe Co.*, 576

F.2d 1157, 1169 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). As part of this determination, the court must ensure that the settlement is not collusive. *Piambino*, 757 F.2d at 1139. Finally, the court has the duty of ensuring that the settlement is not illegal or against public policy. *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir.1980); *Harris v. Graddick*, 615 F.Supp. 239, 241–42 (M.D.Ala. 1985).

In this opinion, the court begins with the easier question of whether the amendment is legal. After finding that it is, the court turns towards the more involved determination of fairness, adequacy, and reasonableness.

### B. Whether the Settlement is Legal

▪ The court finds the amendment to the consent decree, which is essentially a contract between the parties as to the role of Humphries, to be legal. The court can think of only two reasons why the amendment could possibly be illegal: (1) if it went beyond the scope of the alleged violation or (2) if it was improperly race-conscious under standards set out by the United States Supreme Court. The court finds that neither of these eventualities exists.

As to the first concern, the amendment is an appropriate remedy for the alleged violation. *See Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (school desegregation remedies must be tailored to nature of violation). Although the school board has admitted no wrongdoing, the crux of the allegations against Humphries was that he had created a racially hostile environment. By removing him from the school setting and contact with students, the amendment is tailored to the alleged violation. It does not go beyond what is necessary to remedy the concerns of the plaintiffs and the United States. As to the second concern, the amendment, which primarily sets out duties and responsibilities, is race neutral. As such,

---

**18.** Order of January 12, 1995.

**19.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the standard for race-conscious relief under *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) and other cases is inapplicable. The court finds that the contract between the parties as to Humphries's responsibilities and restrictions is legal.

## C. *Whether the Settlement is Fair, Adequate, and Reasonable*

■ The court recently set out factors it may examine in deciding whether a consent decree is fair, adequate, and reasonable. *White*, 867 F.Supp. at 1533. These factors are as follows: (1) the views of the class members; (2) the views of class counsel; (3) the substance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the stage of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense, and likely duration of the lawsuit; and (8) the range of possible recovery. *See Leverso v. SouthTrust Bank of Alabama, Nat. Assoc.*, 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984).

In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. *White*, 867 F.Supp. at 1533; *Shuford*, 846 F.Supp. at 1517. Because the views of the class are so critical, the court must first ensure that class members have been notified of the decree, as required by Rule 23(e) of the Federal Rules of Civil Procedure. In this case, court-approved notice was distributed by publication in the *Randolph Leader* for two consecutive weeks. The notice was also posted at courthouses and schools. The notice summarized the proposed amendment to the consent decree and advised interested persons about how to object in writing and at the fairness hearing. The court finds that the notice was adequate to inform the plaintiff class and other interested parties about the settlement.

When a "settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement 'may appropriately be described as an intrinsically "class" decision in which majority sentiments should be given great weight.'" *Paradise v. Wells*, 686 F.Supp. 1442, 1445 (M.D.Ala.1988) (emphasis deleted) (quoting *Pettway*, 576 F.2d at 1217). Based on these factors, the court finds that majority opinion should be given great weight in examining the amendment to the consent decree. *Cf. Reynolds v. King*, 790 F.Supp. 1101, 1108 (M.D.Ala.1990) (rejecting majority rule when interests differ).

■ The named plaintiffs appear to be split on whether the amendment to the decree should be approved. Almost half of the parents who are named plaintiffs object to the amendment. These parents represent approximately half of the named plaintiff children. As to the class as a whole, the court cannot find on the record before it what percentage of the class objects. The court will assume for the sake of argument that the class opposition mirrors the named plaintiff opposition and that close to half the class objects to the amendment. This is significant and troubling opposition, but, although the court gives it great weight, it is not determinative. The court must closely examine the substance of the objections before reaching a decision.

Based on the written and oral objections, the court finds that there are six primary concerns with the amendment to the decree: (1) the amendment was approved without consulting the plaintiffs; (2) Charlotte Clark–Frieson, the only black member of the school board, was shut out of deliberations; (3) the amendment was collusive and improperly submitted; (4) Humphries cannot supervise the building of the new school while remaining within the confines of the amendment; (5) Humphries is being accorded preferential treatment and should be fired; and (6) there should be a trial so that blacks can air their grievances about Humphries to the court and so the school board would have to admit wrongdoing. The court addresses each of these objections in turn.

First, the vast majority of the objectors complain about the way the settlement was reached. In essence, the objection is that plaintiffs' attorney Seay agreed to the amendment before consulting with his clients. This is a valid concern. As Reverend Johnson expressed at the fairness hearing, "it's unfair that anybody could represent a client and not communicate with them." [20] Nevertheless, any objection to the manner in which Seay reached the settlement, except to the extent it is evidence of collusion or improper filing, has been redressed by the fairness hearing.[21] The court, in response to the concerns of Reverend Johnson and others, provided the citizens of Randolph County, in particular the black class members, notice of the amendment to the consent decree and a chance to raise objections. The court has had ample opportunity to review the objections.

The situation might be different if the court believed Seay had made an unreasonable decision. Based on Seay's testimony, however, it is clear he personally felt Humphries should be fired, but concluded that such relief would not be ordered because the court could address any finding of racial discrimination with a less drastic remedy.[22] Seay also concluded that the plaintiffs could not gain much more at trial than the settlement afforded and possibly would end up with less.[23] The court has great respect for Seay's ability as a civil rights lawyer and as an attorney in class action school desegregation lawsuits and finds his conclusions to be reasonable. The relief accorded by the amendment is certainly within the range of possible recovery.

Because the members of the class have now been afforded an opportunity to make their views known to the court, which must make the ultimate decision, and because Seay came to a reasonable conclusion about what relief would be viable, the way in which Seay handled the consultation process is no longer an issue.

Second, Clark–Frieson, the sole black school board member, claims that she was shut out of the board's deliberations on the amendment to the consent decree, although she acknowledges being present when the amendment was formally approved. This objection must be overruled, except to the extent it suggests collusion or improper filing, because it does not express a substantive problem with the amendment to the decree; nor is there any evidence that the seven-member school board's decision would have been different had Clark–Frieson participated in a different way.

Nevertheless, the court is extremely concerned by allegations that the sole black school board member is not being accorded the rights and opportunities of the white board members. The court reminds the white members of the school board that, under the consent decree, the court retains jurisdiction to consider acts of discrimination in the Randolph County School District. This authority extends to racial relations on the school board. Should this issue be presented to the court in the future in a posture in which it can be considered, the court will not hesitate to address Clark–Frieson's complaint and, if appropriate, order suitable relief.

Third, some objectors claim the settlement was collusive and improperly submitted. This claim is founded on the two above objections—Seay's alleged failure to consult with the plaintiff class and the school board's alleged bypassing of Clark–Frieson—which the court has not yet addressed in the context of collusion and improper filing, as well as allegations that the defendants signed the amendment before they actually agreed to the settlement and that two of the United States's attorneys did not actually sign the document. The court assumes, without so finding, that all of these allegations are true.

The court has previously recognized two types of collusion. *White*, 867 F.Supp. at 1537–38. The usual allegation of collusion is

---

**20.** Transcript of February 10, 1995 fairness hearing, at 15–16.

**21.** The court addresses the collusion and improper filing questions below.

**22.** *See* Transcript of February 10, 1995 fairness hearing, at 64–66, 73 (testimony of Seay).

**23.** *Id.* at 73.

that class counsel or a member of the class benefited at the expense of the class as a whole. There is no support for this possibility in the record. The second type of collusion is a failure to approach the settlement as adversaries. The court is unable to find on the basis of the evidence before it that the negotiations between the parties were anything other than adversarial in nature. For months, the parties adhered to their positions on Humphries. The eventual settlement represents a compromise between these competing positions. The parties were close to trial at the time of the settlement, in a good position to evaluate the strengths and weaknesses of their cases. In light of this history and the posture of the case, the objectors' allegations of improper conduct, while perhaps suggesting that the parties were eager to settle the issue, do not rise to the level of collusion.

With regard to improper submission, the court is satisfied that either at the time of submission or, perhaps, later, all of the parties agreed to the amendment as submitted. The court need not determine exactly when each party agreed to and signed the document because there is no question that all of the parties continue to adhere to this binding settlement, which is now properly before the court.

Fourth, the objectors maintain that Humphries cannot supervise the building of the new school, which would entail broad consultations with the community, without violating the spirit of the amendment. It appears that the primary goal of the government and the plaintiffs was limiting Humphries's contact with and power over students, not his contact with the community as a whole. The court has been presented with no evidence that Humphries's duties will require student contact. If Humphries does violate the amendment, the court will not hesitate to take strong action.[24]

Fifth, some objectors maintain that the school board is giving Humphries preferential treatment when he should be fired for his alleged discrimination against blacks. There are a number of components to this objection: (1) that the school board should not supervise Humphries; (2) that it is a waste of taxpayer money to keep Humphries employed; and (3) that Humphries is being rewarded rather than punished.

With regard to the first component, the court finds nothing wrong with the school board's decision to supervise Humphries. To begin with, it is beyond the court's authority to decide for the board that assuming this duty is a waste of time, as some objectors claim. Although other objectors lack faith in the board's willingness to hold Humphries to the spirit and letter of the amendment, the court assures all concerned that it has the power and the will to step in to enforce the provisions of the decree. In this respect, it is to the advantage of the objectors that the school board, which is directly responsible to the court, is supervising Humphries. The court also finds it reasonable to return authority to the board after three years because any arrangements will still be under court supervision.

The second component is a concern that taxpayers will have to pay Humphries for doing unnecessary work, an objection probably best expressed by Philip Smith at the fairness hearing.[25] The court notes that the alternative is to proceed to trial, which would cost the taxpayers a great deal more money. More importantly, this is a concern that is best addressed in the political arena. If citizens of Randolph County do not support the school board's resolution of this issue, then they have the right to vote the board members out of office.

The third component of this objection is the perception that Humphries is being rewarded rather than punished. Clark–Frieson explained her "opinion that this settle-

---

24. At the fairness hearing, questions arose as to whether Humphries had already violated the spirit of the pending amendment. The court has directed the United States to investigate the matter. Upon receipt of the report, the court will take appropriate action.

25. Transcript of February 10, 1995 fairness hearing, at 34–36.

ment gives Mr. Humphries hero status." [26] She based this opinion on a number of factors, including the luxury of having a three-year contract, working unsupervised, and being provided with computer equipment.[27] Objectors also maintain that the school board is treating Humphries better than other educators who have been accused of wrongdoing. For these reasons, and because of his alleged treatment of African–Americans, a number of objectors argue that Humphries should be fired. In examining the amendment, the court must focus on whether the relevant objectives of the lawsuit have been realized. That is, the court must determine whether the amendment adequately resolves Humphries's alleged role in violating desegregation orders and creating a racially hostile environment. It may be true that, as Clark–Frieson puts it, Humphries is a symbol of separate and unequal education.[28] However, the court does not sit to punish Humphries but rather to ensure that he does not impair desegregation or racial reconciliation.[29] Unless the relief accorded by the amendment is inadequate, the court need not consider the more drastic remedy of ordering Humphries fired.[30]

Nevertheless, the court wants to make sure that Humphries is adequately supervised by the school board and has substantial responsibilities to match his salary. For this reason, the court will require the school board to submit within 21 days a copy of Humphries's job description as well as an explanation of the nature of the supervision. Upon receipt of this submission, the court will take whatever action is necessary to ensure that Humphries is adequately supervised, that his job responsibilities are commensurate with his salary, and that his transfer is not used by the school board, either directly or indirectly, as an indication of approval of his alleged conduct.

Sixth and finally, the court turns to what it perceives to be the primary concern of most of the African–American objectors: the failure to proceed to trial in and of itself. There are two main reasons why the objectors want a trial. The first, perhaps best stated by Reverend Johnson, is "so that the Board of Education of Randolph County cannot say we accept no responsibility, we accept no blame."[31] The court understands the desire to have an all or nothing resolution to Humphries's status, brought about by the frustration of years of grievances.

Clark–Frieson eloquently expressed in her written objection the prevailing sentiment behind the second reason the objectors want a trial:

"Do you not realize that these plaintiffs have never been afforded the opportunity of explaining the events that affected their educational outcomes as a result of going to school under the Supervision of Hulond Humphries, to any decision-making body that took their claims seriously? Have you not considered that they may NEED this unique opportunity to finally liberate themselves by telling the Court about their experiences? This is the only way the students and this community can truly heal—an opportunity that only the Court can provide."

The court assures the objectors that it takes their claims seriously. Four decades after *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the black citizens of Randolph County find themselves fighting what they consider to be a symbol of the resistance to that decision. These concerns are of preeminent importance. The court hopes that, to some extent at least, the fairness hearing allowed for some release of these experiences. The court further notes that the African–American citizens of Randolph County have accomplished a great deal

---

**26.** *Id.* at 22.

**27.** *Id.* at 23–24.

**28.** *Id.* at 29.

**29.** This is not to say that the court in any way condones Humphries's alleged conduct or that Humphries should not be punished. Whether

Humphries should be punished is an issue that would have to be resolved in another proceeding.

**30.** The court sets out its view of the adequacy of the remedy following its analysis of the objections.

**31.** Transcript of February 10, 1995 fairness hearing, at 16–17.

since the prom incident one year ago. They have not only told their story widely, but have seen concrete changes as a result. Still, the court understands that a chance to tell the court about Humphries's alleged acts is desirable.

The reasons espoused by Reverend Johnson and Clark–Frieson to require a trial, although fulfilling important functions, would frustrate the firm judicial policy in favor of settlement. *E.g., Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977). The court is bound to follow this law. Objectors must present a reason why the relief accorded by the amendment, as opposed to the method of settlement itself, is unfair, unreasonable, or inadequate. There appears to be an underlying suspicion that any agreement reached by the school board could not possibly be fair to the black community.[32] The court recognizes the historical basis for this concern as expressed by Clark–Frieson, but notes that the African–American community appears to support the earlier consent decree, which was also negotiated by the school board. A trial is not due because of suspicions about a party to a settlement. It is ultimately the court's duty to decide whether the amendment is fair, not the school board's. The final objection must fall.

In light of the above considerations, the court has independently evaluated whether the amendment is fair, adequate, and reasonable. In doing so, the court has examined the amendment in conjunction with the other provisions of the consent decree in order to see how the final decree resolves the allegations of racial discrimination in the Randolph County schools. The court finds that the amendment, although it does not address all of the objectors' concerns, fairly, adequately, and reasonably addresses the allegations regarding segregation and the creation of a racially hostile environment. It is these allegations upon which the court must base any remedy. Humphries will be limited in contact with and control over students. This addresses the heart of the contentions of the plaintiffs and United States with regard to Humphries. The court recognizes that the amendment is not what everyone wanted and

that feelings are strong among the people involved. Although the plaintiffs may be frustrated in their desire to see Humphries punished, the court cannot take this into account in these school desegregation proceedings. Further, although the argument behind having a trial may be appealing, the court must follow settled law. The court finds that the objections, although many raise serious concerns, do not show that the amendment is unfair, unreasonable, or inadequate. Because of this finding, even the great weight accorded to the substantial number of objectors cannot stand in the way of the court approving the settlement.

The court notes that the school board has previously entered into a lengthy and detailed consent decree that everyone appears to believe is fair. The court takes this agreement as signifying the board's good faith in all aspects of this lawsuit, including those surrounding Humphries. The United States and Seay have promised to monitor diligently the implementation of the consent decree as amended and future developments in Randolph County. The court will do so as well.

### III. CONCLUSION

Finally, it should be remembered that the court has only found that the amendment to the consent decree is fair, adequate, and reasonable, as well as legal. Although with this finding the amendment now has the force of law, whether the amendment in conjunction with the prior consent decree will actually work rests with the citizens of Randolph County and particularly the Board of Education. Some have complained to the court that litigation could have been avoided if the school board had taken the mantle of leadership from the beginning. That may or may not be true. What is true is that if the board now assumes leadership and reaches out to work with all segments of the community, black and white, and if all segments of the community, supporters and opponents of the amendment, in turn reach out to each other to support the settlement, then the consent decree as amended will succeed in

32. *Id.* at 30–31 (testimony of Clark–Frieson).

what really matters—bettering the education of children regardless of race.

An appropriate judgment and injunction will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That all objections to the amendment submitted by the parties to the consent decree previously entered on December 15, 1994, are overruled;

(2) That said amendment to the consent decree is approved and entered this date; and

(3) That defendant Randolph County Board of Education, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, including Hulond Humphries, are each RESTRAINED and ENJOINED:

(A) From failing to comply with the consent decree entered on December 15, 1994;

(B) From failing to comply with the amendment approved and entered this date; and

(C) From failing to submit to the court within 21 days a copy of Humphries's job description and explanation of the nature of supervision over him.

The clerk of the court is DIRECTED to issue a writ of injunction.

The United States Marshall or her representative is DIRECTED to serve copies of this judgment and injunction and accompanying memorandum opinion, the consent decree entered on December 15, 1994, and the amendment entered this date upon defendant Randolph County Board of Education, its members, its superintendent, and Hulond Humphries.

### FIRST AMENDMENT TO
### CONSENT DECREE

On December 12, 1994, the parties filed with the Court a Consent Decree settling all issues raised in the litigation, except for the issue of the "permanent reassignment of Hulond Humphries and on his relationship with the schools of the School District." On December 15, 1994, the Court approved the Consent Decree.

In the spirit of harmony and cooperation, and in an effort to resolve the remaining issues without the need for protracted litigation, the parties have further conferred and have agreed to modify Section III of the Consent Decree as follows:

1. *Consultant to the Board:* Upon entry of this Order, Mr. Humphries shall be employed as a consultant to the Randolph County Board of Education and he shall be supervised by and shall report directly to the School Board. Such employment shall be for a minimum of three (3) years, deemed effective beginning July, 1994. Any assignment beyond July, 1997 of Mr. Humphries' employment shall be mutually agreed upon between the Board and Hulond Humphries as long as such assignment is consistent with the Consent Decree in this matter dated December 15, 1994, and this amendment.

2. *Duties of Consultant:* Mr. Humphries' duties as consultant shall be to work at the direction and pleasure of the School Board. The School Board shall assign such projects to Mr. Humphries as from time to time the School Board feels are in the best interest of all the students, parents and citizens of Randolph County, subject to the restrictions and limitations set forth in Paragraph 3 below. Such projects and assignments shall be consistent with, and within the spirit of the Consent Decree and this Amendment.

3. *Relationship to School Campuses:* During the time Hulond Humphries serves as consultant to the Board, the School Board shall be enjoined from permitting Mr. Humphries from appearing on school campuses on any official or unofficial business during school hours. This restriction shall not prohibit Mr. Humphries from attending any public events, scheduled functions or other school activities open to the general public.

4. *Initial projects:* Initial projects contemplated by the Board include the rebuilding of the Randolph County High School. However, Mr. Humphries shall act as consultant on other projects as directed by the Board. Mr. Humphries shall conduct his activities and work on these assigned projects consistent with, and within the spirit, of the specific restrictions contained in Paragraph 3 above.

5. This Order shall remain in full force and effect until further order of the Court or Mr. Humphries' separation from the School District.

First Amended Order to Consent Decree entered into and approved at Montgomery, Alabama on this 17th day of February, 1995.

Approved as to Form and Content:
Randolph County School District
by /s/ Gerald Romine

    GERALD ROMINE

    Its Chairperson

and by

/s/ W. Terry Travis
    Its Attorneys,
    GEORGE L. BECK, Jr.,
    W. TERRY TRAVIS
    DENNIS R. PIERSON

Private Plaintiffs
by /s/ Solomon Seay
    Their Attorney,
    SOLOMON SEAY

United States of America
by /s/ Poli A. Marmolejos/Ly
    DEVAL L. PATRICK
    Assistant Attorney General
    ISABELLE KATZ PINZLER
    POLI A. MARMOLEJOS

/s/ Sabrina W. Jenkins/Ly
    LAVERNE M. YOUNGER
    SABRINA W. JENKINS
    STEVEN E. BUTLER
    DANA R. CARSTARPHEN
    DEREK LOESSER
    Attorneys, Civil Rights Division