**Barbara Jean BERRY, et al., Plaintiffs,**

**v.**

**SCHOOL DISTRICT OF THE CITY OF BENTON HARBOR, et al., Defendants.**

No. 4:67–CV–9.

United States District Court, W.D. Michigan, Southern Division.

Aug. 20, 1998.

**94**

Kathleen McCree Lewis, Dykema Gossett, PLLC, Detroit, MI, Jonathon D. Rowe, Dykema, Gossett, Spencer, Goodnow, et al., Ann Arbor, MI, Baltimore, MD, Steven Marchese, Harter, Secrest & Emery, Syracuse, NY, for plaintiff.

John D. Tully, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Benton Harbor School District.

George T. Roumell, Jr., William Ferguson Dennis, Riley & Roumell, Detroit, MI, for Coloma Community Schools.

John L. Crow, John L. Crow Law Offices, St. Joseph, MI, Timothy P. Gladney, Ann Arbor, MI, for EAU Claire Public Schools.

Edith C. Harsh, Jennifer M. Granholm, Attorney General, Executive Division, Lansing, MI, Jane Ortis Wilensky, Jennifer M. Granholm, Attorney General, Education Divi-

sion, Lansing, MI, Jennifer M. Granholm, Attorney General, Appellate Division, Lansing, MI, for State Board of Education.

Lisa L. Swem, Thrun, Maatsch & Nordberg, PC, Lansing, MI, for Berrien County Intermediate School District.

Thomas A. Baird, White, Przybylowicz, Schneider & Baird, PC, Okemos, MI, for Michigan Education Association.

Sherry L. Katz–Crank, Miller, Canfield, Paddock & Stone, Lansing, MI, for Benton Harbor Community Academy.

Carl R. Burdick, Kinney, Burdick, Bowman & Engeln, PLC, St. Joseph, MI, for Pathfinder Charter Academy.

## *OPINION RE MOTION FOR APPROVAL OF PROPOSED SETTLEMENT*

HILLMAN, Senior District Judge.

Before the court is a request for approval of two proposed settlement agreements by some, but not all, parties in this 31–year–old school desegregation class action. Parties to one agreement are the plaintiffs and defendants Eau Claire Public Schools and Coloma Public Schools. Parties to the second agreement are plaintiffs and the Berrien County Intermediate School District (BCISD). The principal remaining defendants, Benton Harbor Area School District (BHASD) and the State of Michigan defendants, have not yet reached a final agreement with plaintiffs or other defendants, although negotiations are continuing.

On June 8, 1998, in accordance with the provisions of Rule 23(e) of the Federal Rules of Civil Procedure, the court ordered publication of the scheduling of a fairness hearing on the proposed settlement to be held beginning August 10 at 9:00 a.m., in the Berrien County Courthouse, St. Joseph, Michigan. Pursuant to the terms of that notice, the court received a number of comments from parents, teachers and interested citizens residing in all three districts. The responses included 28 written submissions, as well as requests from seven members of the class and the public to appear and testify at the August 10 hearing.

The court has now had the opportunity to carefully review and consider these written comments, along with a review of one-and-one-half days of sworn testimony heard in the Berrien County Courthouse from 4 public witnesses followed by 8 witnesses called by parties, including three experts. In addition, the court has received numerous exhibits offered by plaintiffs and defendants.

Based on all of the above and for the reasons stated below, I am satisfied that both proposed settlement agreements are fair, adequate, and reasonable. I therefore accept the proposed settlement agreements and adopt them as consent decrees, implementation of which will control the final stages of this litigation.

## I. BACKGROUND

This case began on November 16, 1967, with the filing of a complaint by plaintiffs Barbara Jean Berry, et al., as parents of African–American children then attending the public schools of Benton Harbor, Michigan, against the School District of the City of Benton Harbor, the members of its Board of Education and its Superintendent. In the complaint, the plaintiffs sought preliminary and permanent injunctive relief as to various acts and practices by the defendants, which plaintiffs deemed to be discriminatory or segregative. In July 1971, the district court found several practices carried out by the defendants to be constitutionally discriminatory. On November 1, 1974, the Sixth Circuit Court of Appeals affirmed the district court's findings that the practices were discriminatory and that plaintiffs had made out a prima facie case of *de jure* segregation.

On August 21, 1974 and September 25, 1975, plaintiffs added the following defendants to the case: the State of Michigan, the Attorney General of the State of Michigan, the Michigan State Board of Education, the Superintendent of Public Instruction (collectively, "the State of Michigan defendants" or "defendants Milliken, et al."), the Boards of Education of the Eau Claire Public Schools and the Coloma Community Schools, and the Berrien County Intermediate School District and its Superintendent.

On August 22, 1977, following a trial on the liability of Benton Harbor Area School District (Phase I trial), the district court (then Chief Judge Noel P. Fox) ordered that the case be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. The class was identified as "all present and future students within the Benton Harbor Area School District." This class annually contains in excess of 6,000 students. The court also found defendant Benton Harbor Area School District guilty of acts of segregation in violation of the United States Constitution.

On August 7, 1978, following a second liability trial (Phase II trial), the district court ruled against the State of Michigan defendants, the Berrien County Intermediate School District and its Superintendent, and the Coloma and Eau Claire School Districts and their Superintendents, finding that they had helped to create, perpetuate or contribute to the unlawfully segregated conditions in the Benton Harbor Area School District. The district court issued an amended order requiring the defendants found liable in Phases I and II to formulate a plan to remedy the constitutional violations.

In February 1980, the case was reassigned to the undersigned for remedial proceedings. Following a remedy trial, the court entered its Opinion and Order on May 1, 1981, adopting and ordering the implementation of a desegregation plan. In summary, this plan: (1) ordered the Eaman residential area be returned to the Benton Harbor Area School District; (2) enjoined the transfer of the Sodus II residential area from the Benton Harbor Area School District to the Eau Claire Public School District; (3) ordered the Benton Harbor Area School District to eliminate racially identifiable schools; (4) ordered the creation of magnet programs in the Benton Harbor Area School District; (5) ordered a voluntary program for interdistrict transfers of students between the Benton Harbor, Coloma and Eau Claire School Districts; (6) ordered further remedies relating to curriculum, faculty and staff reassignment and affirmative action goals, in-service training, student discipline, community involvement, monitoring and reporting, and for financing

of the court's remedial plan. On January 24, 1983, the Sixth Circuit Court of Appeals affirmed the May 1, 1981, remedial order and certiorari was denied by the United States Supreme Court on October 11, 1983. *Berry v. School Dist. of the City of Benton Harbor,* 698 F.2d 813 (6th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983).

In September 1991, following ten years of implementation of the remedial plan, defendants Coloma and Eau Claire filed separate motions requesting the court to terminate court supervision and control over Coloma and Eau Claire and to declare both school districts unitary. Thereafter, with the court's encouragement, the parties undertook settlement negotiations.

This is not the first occasion on which this court has had an opportunity to consider partial settlement of this 31–year–old school desegregation litigation. In 1996, this court considered a proposed partial settlement between plaintiffs and defendants Coloma, Eau Claire and the State. Following a preliminary approval hearing, notice and a fairness hearing, I concluded that the 1996 proposed partial settlement was neither fair, adequate nor reasonable, and I rejected the proposed agreement.

The instant agreements were signed and filed on June 23, 1998, together with a joint motion by the settling defendants. Plaintiffs filed an answer agreeing not to oppose the settlements, but expressing concern about overall class understanding and acceptance of the agreements in the absence of settlement with the remaining defendants. On June 25, 1998, the court conducted a hearing to determine whether the agreements were potentially approvable. See *Armstrong v. Bd. of Sch. Directors of the City of Milwaukee,* 616 F.2d 305, 314 (7th Cir.1980) (purpose of court's preliminary approval hearing is to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing."); *Reed v. Rhodes,* 869 F.Supp. 1274, 1278 (N.D.Ohio 1994). On June 30, 1998, the court issue an order, concluding that the agreements were "within the range of possible approval." The order also set forth the dates and forms of legal notice to the class,

and prescribed the means by which members of the class and public could express their support or opposition to the agreements. A fairness hearing was set to begin August 10, 1998, in the Berrien County Courthouse in St. Joseph, Michigan.

Pursuant to the court's June 30, 1998 order, legal notice, including the full text of both agreements, was published on July 19 and July 26, 1998 in the Benton Harbor Herald–Palladium. In addition, a first class letter containing a brief background of the case and settlement was sent to the family of each class member. The letter advised class members of a number of sites at which they could review the proposed agreements. Further, the class notice and text of the agreements was published on the website of the BCISD.

A fairness hearing was held on August 10–11, 1998, as scheduled in the class notice. The matter now is before the court for decision.

## II. STANDARDS FOR REVIEW OF CLASS ACTION SETTLEMENT

■ Settlement of a class action lawsuit requires prior court approval:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Fed.R.Civ.P. 23(e). In order to approve a class action settlement, the court first must determine whether the proposed settlement is potentially approvable. *Reed,* 869 F.Supp. at 1278. The purpose of this preliminary review is to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong,* 616 F.2d at 314. Unless it appears that the compromise embodied in the agreement is illegal or tainted with collusion, the court must order that notice be given to the class of the proposed agreement and must order a fairness hearing. *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983). This court granted tentative approval on June 30, 1998.

■ The goal of the fairness hearing is "to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is 'fair, reasonable, and adequate.'" *Armstrong,* 616 F.2d at 314 (quoting Manual for Complex Litigation § 146, p. 57 (West 1977)). It is beyond question that the law generally favors the settlement of class actions. *Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir.1981), *vacated on other grounds and modified,* 670 F.2d 71 (6th Cir.1982); *Reed,* 869 F.Supp. at 1279. Settlements may be particularly desirable in cases such as this one, where remedial measures must be implemented over extended periods of time and where public support is essential to successful programs. *Reed,* 869 F.Supp. at 1279 (citing Daniel J. McMullen & Irene Hirata McMullen, *Stubborn Facts of History—The Vestiges of Past Discrimination in School Desegregation Cases,* 44 C.W.R.Law Rev. 75). *See also Lee v. Randolph County Board of Educ.,* 160 F.R.D. 642, 646 (M.D.Ala.1995).

■ A settlement on its face represents a bargained give and take between the litigants that is presumptively valid. The court's role in evaluating such agreements "is properly limited to the minimum necessary to protect the interests of the class and the public." *Little Rock School Dist. v. Pulaski County Spec. School Dist. No. 1,* 921 F.2d 1371, 1388 (8th Cir.1990). The court's review "'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *Clark Equipment Co. v. Int'l Union, Allied Industrial Workers of America, AFL—CIO,* 803 F.2d 878, 879 (6th Cir.1986) (quoting *Officers For Justice v. Civil Service Comm'n,* 688 F.2d 615 (9th Cir.1982), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987)). It is not the judge's role to substitute his or her judgment for that of the litigants and their counsel. *Little Rock,* 921 F.2d at 1388; *Armstrong,* 616 F.2d at 315.

The court recognizes, however, that the settlement process is susceptible to certain

types of abuse and as a result the court "has a heavy, independent duty to ensure that the settlement is fair, adequate, and reasonable." *Lee,* 160 F.R.D. at 646.

The court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.

*Armstrong,* 616 F.2d at 315 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974)).

■ Determining whether an agreement is fair, reasonable and adequate must proceed on a case-by-case basis. *Armstrong,* 616 F.2d at 314. The courts, however, have identified a number of factors which a court should consider:

(1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the objections raised by class members; and (7) the public interest.

*Reed,* 869 F.Supp. at 1279 (citing *Vukovich,* 720 F.2d at 922); *Armstrong,* 616 F.2d at 314; *Parents for Quality Educ. With Integration, Inc. v. Fort Wayne Comm. Schools Corp.,* 728 F.Supp. 1373, 1375 (N.D.Ind.1990); *Thompson v. Midwest Foundation Ind. Physicians Ass'n,* 124 F.R.D. 154, 157 (S.D.Ohio 1988); *Bronson v. Board of Educ. of the City School Dist. of the City of Cincinnati,* 604 F.Supp. 68, 73 (S.D.Ohio 1984).

■ The burden of proving the fairness and adequacy of the settlement agreement is on the parties proposing the settlement. 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* ("Newberg") § 11.42, p. 11–94 (Shepard's 1992); 7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1797.1, p. 392 & n. 8 (West 1986); *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62

L.Ed.2d 95 (1979). A district court's decision to approve a settlement is discretionary and must depend on a careful consideration of the facts of the particular case. *Federal Practice & Procedure,* § 1797.1, pp. 393–94.

### A. *The Likelihood of Ultimate Success on the Merits*

■ As noted in the court's 1996 opinion rejecting the proposed settlement, one of the most important factors in assessing the fairness of a settlement agreement is the strength of the plaintiffs' case on the merits balanced against the relief offered in the settlement. *Armstrong,* 616 F.2d at 322. As in 1996, it is the probability of success on unitary status motions that must be balanced against the contents of the settlement agreements.

The court recognizes that its evaluation of the merits of defendants' unitary status motions is limited:

While consideration of this factor will require some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.

*Armstrong,* 616 F.2d at 314. Instead, the court must evaluate the potential risks in light of the proposed settlements to determine whether the settlements are fair overall in light of the possible outcomes. *Reed,* 869 F.Supp. at 1274. The evaluation is complicated by the fact that the proposed settlements resolve only part of this litigation. *See* Manual for Complex Litigation, 3d, § 30.46, p. 245 (Fed.Jud.Ctr.1995) ("The fairness of partial settlements may be particularly difficult to evaluate."). Where, as here, the settlements implicate the continuing responsibilities of Benton Harbor and the State of Michigan, the court must be particularly attentive to the fairness of the agreements. *Id.*

■ The standard for evaluating whether a district has achieved unitary status has been addressed by the Supreme Court three times in recent years. The Court reiterated in those decisions that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimina-

tion." *Board of Educ. of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). It reaffirmed, however, that federal supervision must not be terminated without being satisfied that Constitutional demands have been met. In order for a school district operating under a desegregation order to obtain relief or partial relief from that order, the district must prove that it has complied in good faith with the desegregation decree since it was entered and that the district has eliminated the vestiges of past discrimination to the extent possible. *Freeman v. Pitts,* 503 U.S. 467, 492, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

▮ In considering whether to withdraw or partially withdraw, a court must consider: [1] whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and [3] whether the school district has demonstrated, to the public and to the parents of students of the once disfavored race, its good-faith commitment to the whole of the court' decree and to those provisions of the law and the Constitution that ‘were the predicate for judicial intervention in the first instance. *Pitts,* 503 U.S. at 491, 112 S.Ct. 1430. *See also Missouri v. Jenkins,* 515 U.S. 70, 89, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

Here, defendants Coloma and Eau Claire, along with Benton Harbor, have implemented the court's voluntary desegregation plan since 1981. Since that time, while occasionally disputes have arisen with respect to the court's desegregation order, very little litigation has occurred involving implementation of the desegregation plan. In fact, the voluntary interdistrict plan has transported between the districts each year approximately 800 students for 17 years with relative calm and acceptance.

At the fairness hearing, defendants Coloma and Eau Claire introduced through their experts limited evidence regarding compliance with the court order and achievement of unitary status. Unlike at the 1996 hearing, no effort was made to present a one-sided case in favor of finding unitary status. Instead, because the agreements do not provide for immediate termination of the court's jurisdiction or of all aspects of the 1981 remedial order, the parties focused primarily on the method provided by the agreements for achievement and evaluation of compliance during the intervening three-year transition period. The parties agreed that there had been some substantial measure of good faith compliance with the 1981 order. They agreed to disagree, however, with the precise amount of that compliance, in order to reach a settlement. The evidence presented at the fairness hearing focused on the terms of the agreements requiring reporting of data to plaintiff's counsel for monitoring, the use of an ombudsman to mediate disputes and the precision of the requirements for satisfying the agreements, rather than proving unitary status.

The court observes that plaintiffs' counsel originally filed vigorous opposition to the motions for unitary status at the time those motions were filed in 1991. Since that time, no discovery has been undertaken that would reveal changes in the underlying facts in dispute, nor has counsel indicated any change in defendants' conduct. Moreover, there has been no improvement in the statistical evidence of full compliance. In addition, the court takes note that the controlling decisional law cited by plaintiffs in their 1991 opposition to a declaration of unitary status remains substantially unchanged by subsequent Supreme Court decisions. *See Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715. Instead, in intervening decisions, the Supreme Court merely clarified that unitary status could be achieved on a partial basis and the court's partial withdrawal could be tied to that determination. *Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108; *Jenkins,* 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63. However, neither *Jenkins* nor *Pitts* significantly alters the decisional calculus of *Dowell.*

Certainly the court is aware from the history of this case and the court's monitoring of the 17-year remedy that arguments could

be made both for and against compliance by both Eau Claire and Coloma and both for and against achievement of unitary status on one or more of the *Green* factors. Taken as a whole, however, the court is aware of a substantial level of compliance with the court order in a number of areas.

With respect to the BCISD, the court's initial findings of liability centered upon the role of the BCISD in failing to exercise leadership in addressing and recommending non-discriminatory redistricting proposals and approving the Sodus II transfer of a predominantly white area from the BHASD to Eau Claire. The BCISD's responsibilities under the remedial order included participation in payment for various aspects of the remedial order, participation in development of in-service workshops on race, participation in the Superintendents Council and management of the Council's funds, and an injunction from future property transfers.

During the history of this remedy, the court has been aware of few, if any, concerns about the full cooperation and participation of the BCISD. However, no evidence has yet been developed concerning the existence of any vestiges of the past discrimination. Moreover, beyond measuring compliance with the court's remedial order, measurement of the vestiges of past discrimination is particularly uncertain in the context of this intermediate school district, whose original liability was tied to participation in unconstitutional conduct of individual school districts.

As observed in 1996, the court makes no attempt to determine whether unitary status has in fact been achieved by any of the three districts. Such an attempt in these proceedings would be inappropriate. However, as mentioned above, assessing the chances of success on the merits is a necessary factor in determining the fairness of a proposed settlement.

In contrast with these concerns regarding the likelihood of proving unitary status, the agreements place significant burdens on the settling defendants, substantially greater than those contained in the 1996 proposed settlement. Unlike in 1996, the 1998 Eau Claire/Coloma agreement does not contemplate the immediate termination of the volun-

tary transfer program. Instead, new transfer students will be allowed to enter the districts in the 1998–99 school year. Further, all full-time transfer students in the interdistrict transfer program during 1998–99 will be allowed under the agreement to continue at Eau Claire or Coloma through the twelfth grade. As a result, unlike in 1996, the agreement will not cause the immediate influx into the Benton Harbor school district of 60 or more new students this year only weeks before the beginning of a new school year.

In addition to continuing to allow students to begin at Eau Claire and Coloma during the upcoming school year, the agreements include a provision whereby students will be allowed to select the districts as a school-of-choice for an additional three years. This opportunity, of course, will not be limited to African–American students from Benton Harbor, but will be open to all students within Berrien County. Nevertheless, the option will remain available and will prevent any sudden burdens upon the available resources in Benton Harbor.

The 1996 agreement made no promises concerning the hiring and retention of minority staff and faculty. The agreement promised only that Eau Claire and Coloma would attempt to meet an overall minority staffing goal of ten percent through the 1999–2000 school year. The 1998 Eau Claire/Coloma agreement, in contrast, provides for continued ten percent staffing goals within each job classification, for both certificated and non certificated staff. The defendants' success on these promises will be monitored by plaintiffs during the three-year transition period, and will provide one of the bases for assessing compliance and entitling defendants to be released from the case at the end of those three years.

In addition, unlike the 1996 agreement, the 1998 Eau Claire/Coloma agreement provides for the continued busing of those districts' resident students who elect to attend Benton Harbor magnet programs. Since the districts have in the past (including at the 1996 fairness hearing) been criticized for failing to fully participate in the Benton Harbor mag-

nets, the provision represents a significant promise.

Even more importantly, unlike the 1996 agreement, the 1998 Eau Claire/Coloma agreement provides a mechanism for monitoring transfer students, as well as a complaint-resolution mechanism. The court views the provision of some oversight to be crucial to a successful transition and to a finding of fairness. As previously noted, the 1998 Eau Claire/Coloma agreement does not provide for immediate cessation of this court's jurisdiction. The agreement also provides for continued annual reporting, including some additional reporting criteria. The agreement further provides that plaintiffs' counsel will make prompt objections to any deficiencies of reporting or of conduct. Compliance with the provisions, as with all provisions of the agreement, will form the basis for the court's determination whether to withdraw in three years.

In addition, both agreements provide for the establishment of an ombudsman to resolve complaints referred either by the districts or by individual students. The ombudsman will be selected and supervised by the BCISD, with input from all parties, including plaintiffs. The agreements describe the role of the ombudsman and incorporate the agreed job description for the position. The provision for the BCISD to hire and supervise the ombudsman was the subject of some public comment.

The monitoring function of the ombudsman must be read in conjunction with a central element of both agreements, which purports to discontinue the operation of the Community Education Council and the Superintendents Council upon approval of the proposed settlements. These provision are found at Section III of both 1998 agreements. The 1998 Eau Claire/Coloma Agreement states:

Plaintiffs, Coloma and Eau Claire agree the May 1, 1981 remedial order will remain in full force and effect as to Coloma and Eau Claire from this litigation in its entire-

ty and during the transition period and until entry of a final order dismissing Coloma and Eau Claire with prejudice, except as clarified in the following sentence.[1] Upon the Court's approval of this Agreement, the Community Education Council and the Superintendents' Council, created by the May 1, 1981 order, shall discontinue.

Similarly, the BCISD agreement states:

The May 1, 1981 remedial order will remain in full force and effect as to BCISD during the transition period and until entry of a final order dismissing BCISD from this litigation in its entirety and with prejudice, except as clarified in the following sentence. Upon the Court's approval of this Agreement, the Community Education Council and the Superintendents' Council, created by the May 1, 1981 remedial order, shall discontinue.

The proposed discontinuance of the CEC raised a substantial issue of concern for the court, as well as for several members of the public.

As I read these provisions, both clearly state that they purport to address the continuing viability of the remedial order only insofar as it applies to the district or districts covered by each agreement. This careful language is sensible, inasmuch as a minority of parties would not be in a position to alter or affirm the effect of the court's 1981 order on remaining parties. The sentence purporting to clarify the 1981 remedial order, however, introduces new confusion. By declaring that the CEC "shall discontinue" upon adoption of the agreements, the sentence suggests that these parties may agree to the elimination of the CEC, whose oversight role is directed to problems in Benton Harbor, as well as the settling districts. Benton Harbor has not agreed to a settlement or to use the services of the ombudsman. Elimination of the CEC, therefore, would deprive the court of any assurance of monitoring for Benton Harbor students. Further, the CEC main-

---

1. I note that this sentence, as quoted, appears to transpose the phrase "from this litigation in its entirety and," and apparently was intended to read: "Plaintiffs, Coloma and Eau Claire agree the May 1, 1981 remedial order will remain in full force and effect as to Coloma and Eau Claire during the transition period and until entry of a final order dismissing Coloma and Eau Claire from this litigation in its entirety and with prejudice."

tains other roles in the community distinct from its role as monitor. As set forth in the 1981 order, the goals and objectives of the CEC are to assure:

(1) accurate and adequate public information about all aspects of the desegregation process; (2) continuing quality public education; (3) citizen involvement in the process of desegregation; and (4) peaceful and effective implementation of the court order.

To meet these goals, the CEC is charged by the court with multiple roles: (1) to serve as liaison between the three district communities and the school boards and to provide a forum to develop understanding of the desegregation process; (2) to develop relationships between businesses, colleges and other community resources to strengthen the effectiveness of school programs; (3) to serve as a forum to defuse problems; (4) to articulate community consensus on appropriate methods and actions to solve problems that arise; (5) to serve as the court's monitor on implementation, to make recommendations to the schools boards, and to report to the court. I am satisfied that the settling parties may not stipulate to terminate the existence of an organization whose functions were ordered by this court and whose duties include duties unrelated to those districts.

As a result, and in the context of the preceding sentence in the provisions, I conclude that the clarifying sentence is intended to discontinue the CEC only with respect to its duties and responsibility for Eau Claire, Coloma and the BCISD. I therefore accept Section III of the agreements with that understanding. In light of the changes in the role of the CEC caused by acceptance of these agreements, the court will consider proposals by the remaining parties for any restructuring that may be appropriate.

The continuation of monitoring has been important to courts in accepting settlements of desegregation cases. As stated by Judge Arnold:

The District Court was concerned about the lack of sufficient detail in the plans to guarantee successful implementation. *The answer to this concern lies, we think, in the fact, upon which we place a great deal of weight, that the parties have all agreed to continued monitoring. Indeed, such monitoring by the District Court and its agents is essential.*

*Little Rock,* 921 F.2d 1371, 1386 (emphasis added). *See also Reed,* 869 F.Supp. 1274 (approving agreement containing monitoring component). I am persuaded that the substitution of the CEC's monitoring and complaint facilitation role with an ombudsman is sufficient to protect the class interests at this stage of the litigation. The agreements phase out court supervision of a remedy that has been in place for over 17 years. At such time as this court terminates its involvement, the parties will be obligated to monitor their own conduct. It is sensible to allow them to begin to do so through a mechanism that is less a device of the court and at a time the court and plaintiffs still retain the ability to oversee their performance. In addition, by way of the agreements, the parties have promised to continue the ombudsman during all the years transfer students will continue to attend Eau Claire or Coloma schools, even after the court may have withdrawn. The agreements thus provide a means of monitoring and solving problems beyond the time the court could so order.

As a result, at this late stage of the litigation, it does not seem improper to the court for the ombudsman position to be administered by the BCISD, one of the defendants to the case. In fact, of the parties, the BCISD seems the best situated to perform this function. As an intermediate school district, the BCISD has no students itself who will be calling upon the ombudsman. As a result, the BCISD is in a position to mediate with better objectivity any complaints that may arise.

I pause, however, to express my regret that the position of ombudsman has been designed to prevent the hiring of any person who has served on the CEC at any time. I am concerned that the exclusion of all persons who are most familiar with the desegregation remedy may be interpreted as a disparagement of the sincere and devoted efforts of the many members of the CEC over the years. Defendants represented at the fairness hearing that the goal was to

exclude all potentially biased parties by excluding former employees of the school districts as well as past members of the CEC. I regret the implication that members of the CEC are biased against defendants rather than committed to the fair-minded implementation of the court's remedial order. The CEC was not designed and has never served as an agent of the plaintiff class; it has served as an arm of the court to best implement the court's order. It has been my experience that the CEC board and the Executive Director have at all times conducted themselves in accordance with their duties under the remedial order, not with pursuing the interests of a particular party. As the parties know, the membership of the CEC includes dedicated citizens from all the participating districts. I regret and deplore that the consequence of the agreements eliminates consideration of all of those persons in the communities who are most knowledgeable about the remedy and who have been most concerned about its successful implementation.

Nevertheless, as I observed in my opinion rejecting the 1996 settlement agreement, ending CEC monitoring may not be unreasonable "if another mechanism with the potential to be effective were put in its place." Having reviewed the agreements in their entirety, and with the understanding that the CEC will not immediately discontinue its role as to the BHASD, I am persuaded that the ombudsman position, as proposed in the agreements, provides a satisfactory monitoring mechanism. Obviously the choice of the individual to fill the newly-created ombudsman position, the promptness and fairness in resolving complaints that may be filed, and the overall impartiality of the ombudsman will be monitored by plaintiffs' counsel and closely scrutinized by the court at the end of the three transition years. My residual concerns, therefore, do not undermine my overall conclusions regarding the fairness, reasonableness and adequacy of the settlement agreements.

Although acceptance of the agreements also discontinues the Superintendents Council as to these defendants, the Council can serve no further function in the absence of all

parties. The Superintendents Council was designed to facilitate interaction between the districts and facilitate the resolution of implementation problems. The parties introduced sufficient evidence at the fairness hearing of other regular meetings of the Berrien County superintendents through the BCISD Superintendents Advisory Council. I therefore conclude that discontinuance of the Superintendents Council in its entirety is not a bar to approval of the agreements.

Finally, the agreement with the BCISD, in addition to providing an ombudsman mechanism, provides substantial technical assistance to the BHASD in implementing a contemplated five-year improvement plan. Even if the remaining parties fail to reach an agreement on the financing of such a plan, the BCISD is available to assist in securing alternate or additional funding, as well as assisting in implementing whatever educational plan ultimately is implemented by Benton Harbor. Moreover, the BCISD has promised to provide additional services to reduce the isolation of Benton Harbor parents and students by disseminating timely information regarding BCISD enrichment programs and opportunities for schools of choice.

In sum, the agreements, in contrast with the unacceptable 1996 agreement, contain substantial benefits to plaintiffs. In addition, the agreements continue jurisdiction over the case for a transition period of three years. Further, the agreements provide mechanisms for resolution of complaints and monitoring of performance. Finally, the agreements allow for an orderly transition from the interdistrict transfer program without imposing a sudden burden on the BHASD or the plaintiff class.

"[T]he essence of a settlement is a bilateral exchange. 'The inherent nature of a compromise is to give up certain rights or benefits in return for others.'" *Armstrong*, 616 F.2d at 315 (quoting *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d at 1135) (other citations omitted). In light of the risk to plaintiffs that defendants potentially could prevail on motions for unitary status, either in part or in whole, I am persuaded that the balancing of the risks of

litigation against the benefits of each agreement weighs in favor of approving both proposed settlements.

## B. *The Complexity, Expense, and Likely Duration of the Litigation*

This litigation already has continued in excess of 30 years. The remedy stage, however, has involved only half that period.

Were the court to deny the proposed settlement, the court would anticipate the parties refiling their motions for unitary status. As the Supreme Court has made clear in recent decisions, it is the duty of the district court to return control of desegregated school districts to the local school boards once unitary status has been achieved. *Jenkins,* 115 S.Ct. at 2049; *Pitts,* 503 U.S. at 489, 112 S.Ct. 1430; *Dowell,* 498 U.S. at 247, 111 S.Ct. 630. A finding of unitary status may be partial. *Id.* However, a district court continues to have the obligation to determine both whether the district has "complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell,* 498 U.S. at 249–50, 111 S.Ct. 630.

Discovery and proofs on unitary status motions, as well as anticipated appeals, would likely require substantial litigation. In addition, although the remedy has been ongoing for a lengthy period, if unitary status were not found, the potential exists either to continue under the present desegregation order for some additional period, or for plaintiffs to seek additional relief. Taken together, the court concludes that future litigation would likely be significant.

With regard to the expense to plaintiffs of the litigation, this court previously has held and the parties now concede that as prevailing parties, plaintiffs are entitled to recover from defendants their reasonable litigation costs and attorney fees in defending the remedy. Consequently, financial cost to plaintiffs should be insignificant and should not be a substantial factor in plaintiffs' decision to accept a compromise.

However, as I recognized in 1996, it is appropriate to evaluate the impact on the community of school desegregation litigation as a "cost" of continued litigation:

> This special kind of litigation is extremely costly to all concerned and can be, as indicated in many reported decisions, protracted as well as divisive.

*Fort Wayne Comm. Schools,* 728 F.Supp. at 1376. The court recognizes that continuing the litigation is likely to be costly to the community in terms of divisiveness and uncertainty. As a result, I conclude that this factor cuts in favor of settling the litigation.

## C. *The Stage of the Proceedings and Amount of Discovery*

As the court already has noted, this matter is at an advanced stage of the proceedings. During the course of the remedy, annual reports have been filed by each of the defendant districts, the Community Education Council has monitored complaints, and the court's special master has addressed ongoing concerns that may or may not ultimately have come to the court. As a result, substantial information is available to the parties concerning the operation of the desegregation plan. However, information concerning individual satisfaction with the operation of the plan and with defendants' cooperation is largely anecdotal. No discovery has been conducted on defendants' motions for unitary status.

As in 1996, the court concludes that this factor does not cut strongly in either direction.

## D. *The Judgment of Trial Counsel*

Perhaps the most significant difference in the present proposed settlements from the 1996 proposal is the presence of new counsel for the plaintiff class, appointed by the court at the time the prior settlement was rejected.

As stated in 1996, the court generally will give deference to plaintiffs' counsel's determination to settle a case. *See Armstrong,* 616 F.2d at 325; *Little Rock,* 921 F.2d at 1386; *Reed,* 869 F.Supp. at 1281. Since entry into this case, counsel moved for and received approval of new named plaintiffs to replace those no longer attending school. The record at the hearing reflected that attorneys for the class had spent significant

time consulting with named plaintiffs, attempting to meet their concerns and seeking their approval.

In contrast with the hearing on the 1996 agreement, a named class representative testified at length concerning consultations with counsel and the attention given by counsel to assuring class members understood the provisions of the agreements and their impact. Further, plaintiffs' counsel took seriously her duty to this court to justify the settlements by disclosing all information relevant to the fairness of the agreements. *See Manual for Complex Litigation, Third,* § 30.43, p. 242 (Federal Judicial Center 1995). Plaintiffs introduced exhibits containing the resolutions by the class representatives agreeing to the execution by counsel of the settlement agreements. Counsel also presented testimony of plaintiffs' expert witness, Dr. Leonard Stevens, a nationally recognized expert in school desegregation cases, who actively engaged in discussions with the class and negotiations with opposing parties and remaining defendants. As a result, the court received expert analysis of the fairness, reasonableness and adequacy of the agreements from both defendants and plaintiffs.

Taken together, the judgment of counsel weighs strongly in favor of accepting the class settlement.

### E. *The Nature of the Negotiations*

Related to the opinion of counsel are two other factors: (1) the nature of the negotiations, and (2) collusion. Two types of collusive conduct have been identified by the courts. The first is where counsel or a named representative has benefited at the expense of the class as a whole. The second is where the parties have failed to approach the settlement as true adversaries. *Lee,* 160 F.R.D. at 649.

In the instant case, no suggestion exists of either type of collusion. The amount of attorney fees is expressly reserved by the settlement agreements, and no evidence exists of a specific benefit accruing to one group of plaintiffs or another.

The second type of collusion is essentially an evaluation of the nature of the negotiations. The court is well aware of the length and intensity of negotiations leading to the settlements presently before the court. The court also heard testimony by multiple witnesses at the hearing concerning the undeniably adversarial nature of the negotiations. Further, the parties placed in the record a stipulation between counsel concerning the extent of negotiations.

The court concludes that the history of the negotiations weighs in favor of accepting the settlements.

### F. *The Objections of the Class*

As courts have observed, one of the most critical factors in considering the fairness of a class action settlement is the nature of the opposition by members of the class. *Id.; Vukovich,* 720 F.2d at 923. The court received only 28 comments in response to its notice of the fairness hearing. These have been received into evidence. Only eight of those comments came from members of the class or their parents. Of these, only two were opposed to both agreements, one of which purported to speak for two students. A third opposed the Eau Claire/Coloma agreement, but not the BCISD agreement. In addition, a number of CEC members, some of whom teach in Benton Harbor or Coloma, expressed their concerns about that portion of the agreements involving the discontinuance of the CEC. The court has, however, addressed these concerns earlier in the opinion. Moreover, as non-class members, these objections cannot be used to measure class opposition.

While the fact of class opposition is, of course, important in the court's weighing of the pros and cons of the settlement, this matter is not a popularity contest. The court should not, and has not, merely counted the number of persons favoring the agreements versus the number opposing the agreements. *See, e.g., Armstrong,* 616 F.2d at 326. The court is mindful, however, of the significantly smaller number of responses by class members to these settlements than to the proposed settlement in 1996. The court does not lightly assume that class silence is indicative of its support. *See Armstrong,* 616 F.2d at 326 ("[A] district court should be hesitant

to infer that the class supports a settlement merely because its members are silent. . . ."); 2 *Newberg*, § 11.48, p. 11–117. However, together with the strong evidence concerning the agreement of the named plaintiffs, the minimal opposition suggests that the class as a whole is in favor of the agreements.

Moreover, the substance of the objections suggests that at least some of those opposing the agreements may have misunderstood them. One Benton Harbor resident appeared to express her personal desire to complete her education at Coloma. *See* Court Exhibit 11. However, the agreements provide that if the student is presently attending or begins attending Coloma in 1998–99, she would be entitled to attend through high school graduation. Similarly, another parent speaking on behalf of two students expressed her preference to let the present transfer students be allowed to attend until graduation, with transportation continuing to be provided to those students. *See* Court Exhibit 28. As previously stated, the proposed agreements allow precisely the relief requested by the objector.

In sum, I conclude that the amount and type of objections raised to the settlements were not substantial. I therefore conclude that this factor weighs strongly in favor of approving the settlements.

### G. *The Public Interest*

Courts typically have looked at the question of the public interest in determining whether to approve a settlement of a class action. As I previously indicated, one aspect of the public interest involves the potential for desegregation litigation to be divisive. *Fort Wayne Comm. Schools*, 728 F.Supp. at 1376. The court must consider the congressional preference for resolving school desegregation actions by way of voluntary settlement. *Vukovich*, 720 F.2d at 923. Similarly, settlement fosters the goals of certainty, finality and economy, which lie at the heart of our general preference for settlement of class actions. *Armstrong*, 616 F.2d at 313.

It is the responsibility of this court to resist the temptation, which I concede is ever present, to approve an inadequate settlement merely to end this lengthy lawsuit. *Armstrong*, 616 F.2d at 305 (1980). I have, however, given due weight to the objectives of the civil rights statutes and the Constitution to assure that settlement of this case comports with basic fairness under these laws. *Vukovich*, 720 F.2d at 923.

It should be noted that Michael Stolee, the court-appointed master overseeing this case since 1981, has informally advised the court of his recommendation that these settlements be approved. Dr. Stolee, a nationally recognized expert in this field, has been intimately involved in the day-to-day operation of the court's desegregation plan since 1981, has attended the Superintendents Council meetings over the years, has supervised the operation of the CEC, and was in attendance at the recent fairness hearing. His advice, counsel and assistance to the court has been invaluable for all 17 years.

Taking all of these concerns into account, I conclude that consideration of the public interest supports approving these agreements.

### III. CONCLUSION

The court has specifically addressed each of the factors which must be considered in determining whether a settlement of a class action is fair, reasonable and adequate and should be approved by the court. The court has considered the agreements separately, but has reviewed each as an integrated document, not focusing on specific terms or the lack of those terms. In addition, the court has considered carefully all the sworn testimony, the opinions expressed by the experts and all the written communication received into evidence.

I am persuaded that the proposed settlements are fair, reasonable and adequate to the plaintiff class. I therefore accept the proposed settlement agreements.

For the foregoing reasons, the court grants the joint motion of defendants Eau Claire, Coloma and BCISD to approve the proposed partial settlements. Accordingly, the settlement agreements between plaintiffs, Eau Claire and Coloma, and between

plaintiffs and the BCISD, are hereby adopted as consent decrees.