In re CINCINNATI POLICING.

No. C–1–99–3170.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 5, 2002.

Alphonse Adam Gerhardstein, Laufman & Gerhardstein, Scott T. Greenwood, Greenwood & Associates, Kenneth L. Lawson, Lawson & Associates, Cincinnati, OH, for plaintiffs.

William Peter Heile, Michael James Harmon, City of Cincinnati Law Department, Cincinnati, OH, William Robert Martin, Pat Woodward, Alan Freeman, Dyer Ellis & Joseph PC, Washington, DC, Donald Edson Hardin, Stephen S. Lazarus, Hardin Lefton Lazarus & Marks LLC, Cincinnati, OH, for defendants.

Jay Rothman, Yellow Springs, OH, pro se.

## ORDER

DLOTT, District Judge.

This matter comes before the Court on the joint motion of all parties for class certification and approval of the Collaborative Agreement as settlement of the class claims asserted in this lawsuit. The Court **GRANTS** the motion.

## I. PROCEDURAL BACKGROUND

Plaintiff Bomani Tyehimba filed suit in this Court on April 30, 1999 against the City of Cincinnati and two police officers, in both their individual and official capacities. On December 13, 2000, he moved the Court for leave to file an amended complaint. The Court granted him leave, but instead of filing an amended complaint, on March 14, 2001, the Plaintiff again moved to file an amended complaint. The amended complaint attached to that motion alleged racially discriminatory police practices by the Cincinnati Police Department in violation of the federal and state constitutions and other federal law. Also on March 14, 2001, the Plaintiff moved to certify a plaintiff class and for a preliminary injunction. The motion for class certification sought the appointment as class representatives of the Cincinnati Black United Front ("CBUF") and the American Civil Liberties Union of Ohio Foundation, Inc. ("ACLU"); the motion also sought the appointment as class counsel of Kenneth L. Lawson, Scott T. Greenwood, and Alphonse A. Gerhardstein.

Three parties expressed interest in a collaborative procedure to address the issues raised by the proposed amended complaint: the City of Cincinnati, proposed counsel for the putative plaintiff class, and the Fraternal Order of Police ("FOP"), whose counsel was representing the two police officers sued in their individual capacity. The City of Cincinnati agreed to the participation of the CBUF and the ACLU for purposes of such a collaborative procedure, and these three parties also agreed to the participation of the FOP. By order of May 3, 2001, the Court established the collaborative procedure contemplated by these parties. The Court also retained the services of Dr. Jay Rothman to manage the collaborative procedure as a special master. On March 25, 2002, the Court referred this action to Magistrate Judge Michael Merz, as special master to complete the negotiations referenced in the Order Establishing Collaborative Procedure and a scheduling order of February 8, 2002.

On April 3, 2002, counsel for the putative plaintiff class, the City of Cincinnati, and the Fraternal Order of Police reached an agreement to resolve the issues raised by the proposed amended complaint (the "Collaborative Agreement"). This Collaborative Agreement calls for certification of a plaintiff class and would settle the class claims for injunctive and declaratory relief in the amended complaint attached to the March 14, 2001 motion for leave. Subsequently, the CBUF, the City of Cincinnati, the FOP, and the ACLU ratified the Collaborative Agreement.

Pursuant to the Sixth Circuit's instructions in *Tennessee Association of Health Maintenance Organizations, Inc. v. Grier,* 262 F.3d 559, 565 (6th Cir.2001), on April 19, 2002, the Court provisionally certified the proposed class and preliminarily approved the reasonableness of the Collaborative Agreement. In so doing, the Court found that the Collaborative Agreement was not illegal or tainted with collusion and that the negotiations preceding it had been conducted at arms length. The Court also ordered the City to give notice of the proposed settlement to the class. The Court granted for settlement purposes only the motion for leave to amend complaint filed on March 14, 2001.

The Court advised the parties on May 28, 2002 that it was concerned about the absence of any provision in the Collaborative Agreement for an award of attorney fees to counsel for the putative plaintiff class. It conducted a hearing on the fairness of the agreement on June 6, 2002. The Court concluded proceedings on that day by continuing the hearing in order to receive additional evidence that might prove necessary for the determination of the joint motion. The parties filed a joint status report on July 16, 2002. The Court terminated the fairness hearing by order on July 18, 2002.

## II. CLASS CERTIFICATION

### A. Class Definition

The parties seek certification of the following settlement class:

> All African–American or Black persons and people perceived as such who reside, work in and/or travel on public thoroughfares in the City of Cincinnati, Ohio either now or in the future and who are stopped, detained, or arrested by Cincinnati Police

Officers or their agents, and citizens of any race who have been or will be subjected to a use of force by Cincinnati police officers and their agents.

They also ask the Court to appoint the CBUF and the ACLU as class representatives and Scott T. Greenwood, Kenneth L. Lawson, and Alphonse A. Gerhardstein as class counsel.

## B. Federal Rule of Civil Procedure 23

Federal Rule of Civil Procedure 23 governs class actions. Rule 23(a) specifies the prerequisites to certification of any class: numerosity, commonality, typicality, and adequacy. In addition, a class action is maintainable only if one of the provisions of Rule 23(b) is satisfied. Certification of a class for settlement purposes only is permissible, but the existence of a proposed agreement obviates none of the requirements of Rule 23. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

## C. Organization Standing

■ One issue anterior to consideration of these requirements is whether the Court properly may consider the CBUF and the ACLU to be members of the class they seek to represent, since Rule 23 provides that "[o]ne or more members of a class may sue or be sued as representative parties." It is settled that "an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). More specifically,

An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 179, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *see also Citizens Against Tax Waste v. Westerville City Sch.,* 985 F.2d 255, 257 (6th Cir.1993).

■ The evidence before the Court indicates that both the CBUF and the ACLU satisfy this test. Many of their members claim injuries sufficient to confer standing on them to bring suit against the City of Cincinnati. The interests at stake are germane to the purposes of both organizations. The ACLU seeks to guard against the abridgment of civil liberties and is particularly concerned with race-biased policing. The CBUF was founded to combat racial subordination in Hamilton County, Ohio. The class claims these organizations assert are for injunctive and declaratory relief against alleged practices of the City of Cincinnati; the participation of the organizations' individual members is not required.

## D. Rule 23(a)

### 1. Numerosity

■ Class membership easily numbers in the tens of thousands. The Court heard testimony to that effect, and it is a matter that is not subject to reasonable dispute. *Cf.* Fed.R.Evid. 201 (judicial notice). Joinder of so many persons is clearly impracticable. The requirement of numerosity is satisfied.

### 2. Commonality

■ There are questions of law and fact common to the class. Common questions of fact include whether and how the Cincinnati Police Department uses race in its policies and procedures. Whether the allegations in the amended complaint entitle class members to injunctive relief is a common question of law. This satisfies the commonality requirement.

### 3. Typicality

■ "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996). Here, all class members' claims arise from the same alleged practices. All class members' claims are based on the same legal theory—that is, that these practices violate the federal and state

constitutions, as well as federal law. The claims of the representative parties are thus typical of class members' claims. *Cf., e.g., Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 102 F.R.D. 457, 463 (N.D.Cal.1983) ("Plaintiffs allege a uniform cause [*sic*] of conduct undertaken by defendants which has resulted in violations of constitutional rights common to all members of the class and class representatives. Therefore, the ... typicality requirement is met.").

### 4. Adequacy

■ To satisfy the adequacy requirement, "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1083 (citation omitted). Here, having considered the declaration of Nathaniel R. Jones and the curricula vitae of proposed class counsel, and having observed their performance in the course of this litigation, the Court has no difficulty finding that proposed class counsel is qualified. Messrs. Gerhardstein, Lawson, and Greenwood all have long and distinguished careers in prosecuting and vindicating civil rights claims, and collectively, they possess substantial experience in class actions. Their conduct in the instant litigation was skillful and tireless.

The adequacy of the representatives, however, is not as plain. There is no reason to doubt that the ACLU will fairly and adequately protect the interests of unnamed class members,[1] but at least one class member has expressed a lack of confidence in the CBUF. "[O]nce members of the class demonstrate any degree of mistrust or the named party's representational abilities or his motives are questioned, courts tend to give very careful attention to the Rule 23(a)(4) issue." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1765, at 279 (2d ed.1986). The Court heard some testimony at the June 6,

2002 hearing concerning an incident in which, apparently, certain members of the CBUF tore up copies of the Collaborative Agreement at Cincinnati City Hall. Reverend Damon Lynch III, President of the CBUF, testified that the CBUF had felt that the City was not complying with the spirit of the Collaborative Agreement and intended its action at City Hall to be symbolic. Certainly, a class representative must act vigorously on behalf of the class, but class representatives must take care not to mislead class members concerning the legal status of class claims. A reasonable observer of the CBUF's conduct at City Hall could have concluded that there was no proposed settlement pending or that the CBUF had withdrawn its support from that settlement. In fact, the opposite was true: The CBUF had ratified the Collaborative Agreement and moved the Court for its approval.

Also at the June 6, 2002 hearing, though, the Court heard much eloquent testimony from Rev. Lynch indicating that the CBUF presently understands its role as a class representative and is eager to implement the Collaborative Agreement. Furthermore, the Court observed CBUF officials participate with dedication in the negotiation and drafting of the Collaborative Agreement. The Court discerns no disabling formal conflicts between the proposed class representatives and unnamed members of the class, particularly since the class claims do not seek damages. *Cf. Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). On balance, then, the Court concludes that the ACLU and the CBUF "will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4).

### E. Rule 23(b)

■ A class action is maintainable where "the party opposing the class has acted or

---

1. Though unnecessary to decide the instant motion, the Court notes that "if there is more than one named representative, it is not necessary that all the representatives meet the Rule 23(a)(4) standard; as long as one of the representatives is adequate, the requirement will be met." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1765, at 277 (2d ed.1986).

refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Rule's Advisory Committee Notes explain that illustrative cases for this subdivision "are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Such is the case here.

## III. SETTLEMENT OF CLASS CLAIMS

■ Federal Rule of Civil Procedure 23(e) mandates, "A class action shall not be dismissed or compromised without the approval of the court." The purpose of this subdivision is to protect unnamed class members from unfair settlements affecting their rights. The Court may either accept or reject the proposed settlement, but it may not modify its terms. *Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). In deciding whether to approve a class action settlement, the "ultimate issue" for the Court is whether the proposed settlement "is fair, adequate and reasonable." *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983). District courts must "appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of all the relevant circumstances." *Evans,* 475 U.S. at 742, 106 S.Ct. 1531. Courts in this district generally consider a number of factors, including the following:

    (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement;

    (2) the complexity, expense and likely duration of the litigation;

    (3) the stage of the proceedings and the amount of discovery completed;

    (4) the judgment of experienced trial counsel;

    (5) the nature of the negotiations;

    (6) the objections raised by the class members; and

    (7) the public interest.

*In re Telectronics Pacing Sys., Inc.,* 137 F.Supp.2d 985, 1009 (S.D.Ohio 2001). In certain cases, a court may be able to consider each factor individually. More often, however, inquiry into one factor necessarily overlaps with inquiry into another.

■ The amended complaint alleges that the Cincinnati Police Department employs policies and procedures that discriminate against African Americans on the basis of race and that the municipality is deliberately indifferent to the constitutional rights of African Americans. The amended complaint charges that Cincinnati police officers routinely detain and search African Americans without any suspicion of criminal activity. It charges that officers investigate white people and African Americans differently, and that they retaliate against African Americans who protest such treatment. It suggests that the City uses racial criteria to decide whom to charge with which criminal offenses, and it alleges that Cincinnati Police Department commendation practices result in the arrest of disproportionate numbers of African Americans.

These factual allegations are broad-ranging. To develop them for trial would require discovery on a colossal scale, which could easily take years to complete. And to prove them might well necessitate a trial spanning months. Needless to say, litigating this case to judgment would cost a great deal of money. "In short, the Court has no doubt that 'the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court.... The prospect of such a massive undertaking clearly counsels in favor of settlement.'" *Levell v. Monsanto Research Corp.,* 191 F.R.D. 543, 556 (S.D.Ohio 2000) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir.1998)) (internal quotation mark omitted).

Whether Plaintiffs could indeed prove these allegations is difficult to determine, largely because little formal discovery has taken place in this case.[2] It is not clear,

---

**2.** Because little formal discovery has taken place, the Court places less weight on the judgment of

however, that the law would require them to prove all of these allegations in order to obtain sweeping injunctive relief. The Supreme Court has explained "that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." *Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[3]

The Supreme Court's "decisions have established that all laws that classify citizens on the basis of race ... are constitutionally suspect and must be strictly scrutinized. When racial classifications are explicit, no inquiry into legislative purpose is necessary." *Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *see also Adarand Constr. Inc. v. Pena,* 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized"). To survive strict scrutiny, a race-based classification must (1) be narrowly tailored (2) to serve a compelling state interest. *See Shaw v. Hunt,* 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("drawing racial distinctions is permissible where a governmental body is pursuing a 'compelling state interest.' A State, however, is constrained in how it may pursue that end: '[T]he means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose.'"). It is difficult to comprehend how the use of race in routine policing—for example, in the description of a suspect when the police are not in hot pursuit—could satisfy this test. *See generally* Randall Kennedy, *Race, Crime, and the Law* 147–63 (1997).

Thus, though the absence of significant discovery renders relatively unknown the facts to which the law would be applied, an injunction flatly prohibiting the police from using race in their routine work would seem to be relief within the realm of possibility. This is the backdrop against which the Court assesses the relief offered in the proposed settlement.

The Collaborative Agreement addresses policing in a comprehensive and nuanced manner. It provides five principal forms of relief. First, it commits to the implementation of community problem-oriented policing as the organizing philosophy of Cincinnati policing. This philosophy treats crime and disorder as problems to be solved by government in cooperation with citizens, rather than merely as matters of law enforcement. Among the ways the Collaborative Agreement implements this philosophy are training, research into best policing practices across the country, new commendations, a community relations office, and a protocol for securing appropriate information technology systems. In addition, one paragraph describes specifically the manner in which police officers shall conduct detentions of persons (whom they then release) in the course of investigations. The Collaborative Agreement as a whole, and the provisions concerning community problem-oriented policing in particular, have benefitted from the insight and hard work of University of Cincinnati Associate Professor of Criminal Justice John Eck. Dr. Eck, a nationally renowned expert on police practices, invested substantial labor in assisting the parties during their negotiations.

Second, the Collaborative Agreement requires the development of extensive data col-

experienced trial counsel. *See Williams,* 720 F.2d at 923 ("the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered"). Certain evidence presented at the June 6, 2002 hearing did suggest that the parties have engaged in more significant informal discovery. Whatever weight this factor deserves, however, does tilt the scales toward approving the proposed settlement's reasonableness, since Messrs. Greenwood, Lawson, and Gerhardstein are very experienced trial counsel and they support this agreement as a fair settlement.

3. To understand why the Supreme Court used the disjunctive "but" before discussing the Equal Protection Clause, one must remember that under the Fourth Amendment the reasonableness of any particular seizure is entirely objective: if a motorist violates a traffic law and a police officer then seizes the motorist, the seizure does not offend the Fourth Amendment, even if the police officer subjectively decided to seize the motorist solely because of the motorist's race. *See Whren v. U.S.,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

lection systems to enable the empirical measurement of crime, disorder, police officer activity, relationships between the police and the communities they serve, as well as perceptions of these. This data will permit long-term evaluation of the extent to which police practices are working with reference to multiple considerations and criteria. Third, the Collaborative Agreement incorporates by reference an April 12, 2002 Memorandum of Agreement between the City of Cincinnati and the United States Department of Justice. This Memorandum of Agreement sets forth many specific requirements about police use of force, chemical spray, canines, and beanbags, as well as police training and risk management systems. Fourth, the Collaborative Agreement requires the City to create an organization to receive, investigate, and process citizen complaints of police misconduct (the "Citizen Complaint Authority"). This organization will have a paid staff and substantial powers at its disposal to aid investigations.

Finally, the Collaborative Agreement provides for a system to resolve disputes arising under it and ensure all parties' compliance with its terms, a system terminating ultimately with this Court. In another civil rights case where a proposed settlement con-cerned structural reform, the Eighth Circuit found the inclusion of monitoring by the district court to be a factor weighing substantially in favor of the fairness of the agreement:

> The answer to this concern lies, we think, in the fact, upon which we place a great deal of weight, that the parties have all agreed to continued monitoring. Indeed, such monitoring by the District Court and its agents is essential. It is important for the settlement plans to be scrupulously adhered to ... and it will be the job of the District Court to see that this monitoring is done effectively, and that appropriate action is taken if the parties do not live up to their commitments.

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1386 (8th Cir.1990). Judge Arnold's words apply with equal force here.

The Collaborative Agreement does not include the sort of sweeping command to proscribe race from policing that equal protection jurisprudence suggests might be obtained, and it is fair to ask whether that absence renders the Collaborative Agreement an unjust compromise.[4] It does not.

---

4. Also absent from the contents of the Collaborative Agreement is any reference to attorney fees for the plaintiff class. Although the law imposes no *per se* prohibition of negotiated fee waivers by prevailing civil rights plaintiffs, such a waiver could be a cause for concern about the fairness of any associated settlement. *See Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). Such a waiver in this case could implicate the agreement's fairness in at least three ways. First, if attorneys for the plaintiff class had simply donated their skills for over a year as a pastime with no expectation of payment, a reasonable person would have ample cause to question the quality of their representation. Second, had they worked for over a year with the expectation of a reasonable fee award and then been denied it at the penultimate moment, a reasonable person would have cause to question their desire to advocate zealously for their clients during the life of the agreement. Third, the Court received evidence that "[s]ecuring competent counsel for complex civil rights cases is extremely challenging.... [S]ecuring competent counsel such as these for a civil rights case in Cincinnati is particularly difficult." (Decl. of Nathaniel R. Jones at ¶ 6.) A refusal to pay attorney fees to the prevailing party in this case might reasonably have been interpreted as a punitive measure to deter future civil rights suits. To quote Judge Arnold again, "Lawyer-bashing is popular in some quarters, and some lawyers deserve criticism, but the efforts of counsel in this case are worthy of substantial recognition." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1392 (8th Cir. 1990).

Because the Collaborative Agreement does not indicate on its face whether the plaintiff class would receive a reasonable attorney fee award from the City of Cincinnati, on May 28, 2002, the Court did "inform the parties of its precise concerns and give them an opportunity to reach a reasonable accommodation." *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir.1983). In response, the parties represented that (1) counsel for the plaintiff class seeks $600,000 in fees and expenses, (2) they have received substantially more than half that amount, raised from private sources, and (3) as additional funds become available, they will be disbursed to counsel for the plaintiff class. (Doc. # 87.) These representations sufficiently allay the Court's concerns about the absence of any provision in the Collaborative Agreement relating specifically to attorney fees.

The Collaborative Agreement provides relief different in kind than that obtainable through litigation. As Professor Stuntz recently observed,

> [R]acial profiling ... is the great issue of our time.... But profiling is an issue best solved by indirection. If confronted directly, it is intractable—easy to forbid in theory, impossible (and maybe inadvisable) to root out in practice, for reasons that go to the heart of why police officers do the things they do. At the same time, the size of the problem might be reduced significantly if the law did two things it does not presently do: Make alternatives to profiling cheaper for the police, and reduce the harms profiling causes when it happens.

William J. Stuntz, *Local Policing After the Terror*, 111 Yale L.J. 2137, 2142 (2002).

The Collaborative Agreement addresses these alternatives and does more. The ultimate interest of the plaintiff class is truly the same as that of police officers: assuring efficient and effective policing for all citizens, regardless of race, in an atmosphere of mutual respect.[5] A constitutional command prohibiting the use of race in routine policing is at best a very blunt tool with which to bludgeon the problems described in the amended complaint. The Collaborative Agreement, in contrast, is more like a surgical instrument, designed by persons who intimately know the specific circumstances of Cincinnati to remedy the particular problems confronting it by using the best available science in a spirit of collaborative construction.

The process that produced the Collaborative Agreement was extraordinary in several respects that bear on its fairness. First, negotiating the language of the Collaborative Agreement required hundreds of hours of effort by attorneys for all parties. In addition, and importantly, the Fraternal Order of Police was a formal party to the negotiation of this agreement. The FOP would not have been a necessary party had this case been litigated to judgment, but its participation here vastly increases the likelihood that the Collaborative Agreement will be implemented successfully. In the final days of drafting, representatives of the CBUF and the FOP and city council persons themselves participated in negotiations that spanned days, often with little or no rest. The Court did not participate in these negotiations, but it did observe them: They were highly adversarial and extremely intense, sometimes taxing their participants literally to the limits of their physical endurance. These were undoubtedly the most challenging negotiations that the Court has observed during its tenure on the bench.

At least as noteworthy as these negotiations was the work by Dr. Rothman in the months preceding them. Through surveys, in-person discussion sessions, and exhaustive data collation and analysis, Dr. Rothman and the parties ascertained five consensus goals for police-community relations of the entire Cincinnati community. The Collaborative Agreement recites those five goals and uses them as a structuring framework. Thus, the proposed settlement strongly reflects the public interest. In addition to the specific relevance of Dr. Rothman's work, "[s]ettlements may be particularly desirable in cases such as this one, where remedial measures must be implemented over extended periods of time and where public support is essential to successful programs." *Berry v. Sch. Dist. of the City of Benton Harbor*, 184 F.R.D. 93, 97 (W.D.Mich.1998).

Rule 23(e) also mandates that class members be provided with notice of any proposed settlement. By order of April 19, 2002, the Court directed the City of Cincinnati to publish notice for three consecutive weeks in the *Cincinnati Enquirer*, the *Cincinnati Post*, and the *Cincinnati Herald*. The Court received evidence that the City published notice in compliance with the Court's order. This was the "best notice practical under the circumstances," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and the length of

---

5. Indeed, the Court knows this to be the case because of Dr. Rothman's work in identifying five consensus goals of different groups in Cincinnati.

time between the notice, the hearing, and all other pertinent dates was easily sufficient to afford all parties "a full and fair opportunity to consider the proposed decree and develop a response." *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983). Not a single class member objected to the proposed settlement.[6] This factor weighs heavily in favor of approving it as fair.

Finally, at the June 6, 2002 hearing, the Court heard testimony from several distinguished witnesses who had personal knowledge of other courts' resolutions of legal challenges to allegedly racially biased policing. These witnesses uniformly concluded that the Collaborative Agreement is the most comprehensive and best resolution of any in the country. The Court agrees.

## IV. CONCLUSION

Certification of the proposed class, with class representatives and class counsel as proposed, is appropriate. The Collaborative Agreement is a fair, adequate, and reasonable settlement of the class claims for injunctive and declaratory relief in the amended complaint. Therefore, the Court hereby **GRANTS** the joint motion of all parties for class certification and approval of the Colla-

---

**6.** Although she did not object to the proposed settlement, Monica R. Williams did file a notice of her intent to speak at the June 6, 2002 hearing and, when afforded that opportunity, sought and obtained permission from the Court to file a memorandum concerning the Collaborative Agreement. (Doc. # 81.) This memorandum, filed on behalf of an organization called the Coalition for a Just Cincinnati, identifies three areas of concern: insufficient detail on police standards, the potential for interference with the proposed Citizen Complaint Authority by the City of Cincinnati's administration, and the potential that the monitor contemplated by the Collaborative Agreement will be biased in favor of police officers. Ms. Williams stated, "[W]e are not objecting to the agreement in total, but instead are pointing out what we believe to be the most serious issues." These critiques by Ms. Williams and the Coalition for a Just Cincinnati are thoughtful, but the Court may not make the mod-

borative Agreement as settlement of the class claims asserted in this lawsuit.

IT IS SO ORDERED.

ifications they suggest. As discussed above, the Court may either accept or reject the proposed settlement, but it may not modify its terms. *Evans v. Jeff D.,* 475 U.S. 717, 727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). The Court does not believe that these critiques warrant a conclusion that the Collaborative Agreement is unfair. The answer to the first and third concerns is that ultimate enforcement of the agreement will be the responsibility of the Court. The answer to the second concern is that the powers and independence of the Citizen Complaint Authority, as envisioned by the Collaborative Agreement, are far from illusory. Indeed, the Court heard the testimony of Keith Borders, an attorney who served as the chairperson of an earlier city organization called the Citizens Police Review Panel, that the Citizen Complaint Authority would enjoy "the most independence of any panel that we've seen in the country."